Simon M. LAZARUS,
Petitioner-Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.

Mina LAZARUS, Petitioner-Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.

Simon M. and Mina LAZARUS,
Petitioners-Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.

Nos. 73–2737 to 73–2739.

United States Court of Appeals, Ninth Circuit.

April 2, 1975.

Ben Margolis (argued), Los Angeles, Cal., for petitioners-appellants.

Donald Olson (argued), I.R.S., Washington, D. C., for respondent-appellee.

## OPINION

Before CHAMBERS and KOELSCH, Circuit Judges, and JAMESON,* District Judge.

JAMESON, District Judge:

Three actions are consolidated on this appeal. In Cause No. 73–2739, the petitioners, Simon and Mina Lazarus, husband and wife, seek review of a judgment of the United States Tax Court sustaining an income tax deficiency assessment in connection with an alleged "private annuity" transaction in which petitioners transferred stock to an irrevocable trust in return for a joint and survivor "annuity". In Causes Nos. 73–2737 and 73–2738, companion cases involving the same transaction, petitioners challenge the gift tax assessed against them individually as a result of the transfer of stock to the trust.[1]

---

* Honorable W. J. Jameson, United States Senior District Judge for the District of Montana, sitting by designation.

1. The opinion of the Tax Court containing findings of fact and conclusions of law is reported at 58 T.C. 854.

## Background

In 1955, petitioners acquired title to a parcel of real property in Los Angeles. A shopping center was built by petitioners on the land in 1958–1959. Because of numerous factors, including their age and the illness and marital problems of members of their family, petitioners began considering possible estate and tax-planning techniques. Their attorney, Harry Margolis, suggested a plan whereby the land and shopping center would be placed in trust for members of the petitioners' family and the petitioners in turn would receive an annuity.

Pursuant to the directions of Margolis, the petitioners entered into a trust agreement on April 30, 1963 establishing an irrevocable trust with Arawak Trust Company Limited, a Bahamian corporation, serving as trustee.[2] Petitioners' children and numerous relatives were named as beneficiaries of the trust, which was initially funded with $1,000. Meanwhile, on April 15, 1963, petitioners had formed the N & V Realty Corporation and on October 1, 1963 transferred the shopping center to it in exchange for N & V stock.[3]

On December 1, 1963, Arawak was replaced as trustee by Aruba Bonaire Curacao Trust Company Limited (ABC), another Bahamian corporation. Pursuant to the overall estate plan devised by Margolis, petitioners on December 18, 1963 entered into what was labeled an "Annuity Agreement" with ABC. The agreement recited that petitioners, contemporaneously with the execution of the agreement, transferred to ABC all the capital stock of N & V Realty in return for ABC's agreement to pay to petitioners the sum of $75,000 per year. The payments were to be made on or before June 30 of each year, beginning in 1964, for the period of petitioners' lives, including the full life of the survivors. Petitioners had a joint and survivor life expectancy of about 21 years. The fair market value of the stock of N & V Realty, and of its shopping center property, was $1,575,000. Petitioners' basis in the stock of N & V Realty at the time of transfer to the trust was $718,406. The actuarial value of the $75,000 annuity was $864,533. The agreement recited that no gift was intended to be given to ABC and that no security of any kind had been reserved for the annuity agreement. ABC was given full power to dispose of the stock as it saw fit.

On January 2, 1964, ABC sold the stock of N & V Realty to a Bahamian corporation entitled World Entertainers Limited.[4] As consideration for the transfer of the stock, World Entertainers executed a non-assignable promissory note,[5] agreeing to pay to ABC as trustee, the sum of $1,000,000 on January 1, 1984. The note also provided that ABC was to receive annual interest payments of $75,000.[6] The payments were to be made on

---

**2.** Arawak agreed to accept the trust on the conditions that (1) the shopping center be incorporated and only the stock of the corporation be transferred to Arawak; (2) someone familiar with the shopping center be involved in its management; and (3) Arawak be authorized to dispose of the ownership of the shopping center almost at once.

The trustee was granted broad powers with respect to the trust—the only powers retained by the trustors being the right to replace the current trustee with another independent corporate fiduciary with the concurrence of the eldest living beneficiary.

**3.** At about the same time petitioners formed another corporation, Lazarus Realty Company, through which petitioners performed their management obligations with respect to the shopping center until 1967, receiving an annual fee of $24,000.

**4.** Subsequent transactions with respect to the sale of the N & V stock and shopping center property and management of the property are set forth in detail in the Findings of the Tax Court.

**5.** The note is entitled "Non-Negotiable Promissory Note" and is so referred to in the Tax Court opinion. The note expressly provides that it "shall not be assignable by the Promisee except with the express written permission of the Promisor".

**6.** The note contained a provision for redetermination of the principal sum prior to 1981 on the basis of the appraised value of all of the assets of N & V Realty, the redetermined principal to be payable at the rate of $100,000 each year, with the interest adjusted downward as the principal is paid.

June 1 of each year, beginning in 1964, and continue until the principal was paid. The sale to World Entertainers had apparently been contemplated during 1962–1963 while petitioners and their attorney were in the process of negotiating the trust with Arawak. It was stipulated that during this time "Arawak determined that a Bahamian corporation *that it represented and managed,* World Entertainers Limited, would be interested in purchasing the shopping center when incorporated". (Emphasis added).

Petitioners' attorney Harry Margolis represented numerous trusts for which Arawak and ABC served as trustee. It was stipulated that Margolis represented more than 150 ABC trusts, a number greater than any other single attorney.

Between 1964 and 1967, the petitioners received $300,000 from the trust.[7] In their 1964 joint income tax return, petitioners reported no income from payments received pursuant to the "Annuity Agreement". They treated the receipts as payments pursuant to a private annuity arrangement. Using an "investment in contract" of $1,575,000, and an "expected return" of the same amount, they determined that the "percentage of income to be excluded" as annuity income was 100 percent. In an explanation attached to their return, they stated:

> "On November 18, 1963 [sic], taxpayers transferred all of the stock of N & V Realty Corporation in exchange for a private annuity. The stock had been acquired April 15, 1963, and had a basis of $718,406. The fair market value of the stock was $1,575,000. Taxpayers are to receive $75,000 per year for life on a joint and survivor basis, the actuarial term of which is twenty one years. Taxpayers elect to report only such installments as may be actually received by them and taxpayers herewith report the payments

received as being a recovery of basis only at this time."

Petitioners followed the same procedure in 1965.

In his notices of deficiency, the Commissioner of Internal Revenue determined that petitioners were taxable on their receipts from the trust under the annuity provisions and owed an additional $111,192 in income tax for the years in question. He determined also that the petitioners individually owed gift taxes for 1963 amounting to $141,288.62, based on a gift to the trust of the difference between the fair market value of the property transferred to the trust and the value of the annuity when it was created in 1963.

### Tax Court Opinion

The contentions of the parties before the Tax Court were summarized in the court's opinion as follows:

> "Petitioners contend that they sold their N & V stock to the trust in consideration for a 'private annuity agreement' which did not have an ascertainable fair market value. Consequently, they urge, they realized no taxable gain in the year of the sale and will realize no such gain until they have recovered their adjusted basis ($718,406) in the N & V stock. Moreover, since the transaction took the form of a sale for adequate consideration, petitioners maintain, they incurred no gift tax on the transfer to the trust; and, under the rationale of their position, at the time of their deaths neither of their estates will owe any estate tax with respect to the N & V stock or its proceeds.

> "In other words, petitioners contend that they have so arranged the disposition of their shopping center that they will receive $75,000 per year as long as they live, will pay no income tax on

---

7. Petitioners received $75,000 in 1964, $150,-000 in 1965, $75,000 in 1966, and nothing in 1967. On January 1, 1968 the "annuity agreement" between petitioners and ABC was revised to provide for annual payments of $62,-500 to Simon and $42,500 to Mina, or a total of $105,000 per year. As the $75,000 interest

on the World Entertainer's note constituted the only income of the trust, it is reasonable to conclude, as the Tax Court did, that an election to have the principal of the World Entertainer's note redetermined (see Footnote 5) was made. Otherwise, the trust could not have made the increased payments.

the first $718,406 of their receipts, and will pay income tax at capital gain rates on the balance of their receipts, if any. Furthermore, under their analysis, the value of the N & V assets remaining at their deaths will pass to their children and grandchildren without any gift tax or estate tax having been incurred.

"Respondent contends that the substance of the transaction was not a sale but was a transfer of property to the trust for the benefit of petitioners' children and grandchildren, subject to a reservation of the right to have the yearly income of the trust ($75,000) distributed annually to petitioners, or the survivor of them, for life. On this ground, respondent maintains that petitioners are taxable on the payments which they received from the trust during the years in controversy."

Following a thorough review of the facts and the inferences to be drawn therefrom, the Tax Court concluded that the petitioners had, as contended by the Commissioner, transferred rather than sold the shopping center stock to ABC and that petitioners had reserved the right for life to the income from the stock so transferred. The Tax Court therefore held that under § 677(a) of the Internal Revenue Code, 26 U.S.C. § 677(a), the petitioners were the owners of the trust and were taxable on the income therefrom under § 671 of the Code.[8] In addition, the Tax Court agreed with the Commissioner that the petitioners in retaining only a life estate in the trust income had made a gift of the remainder interest and were thus subject to a gift tax.

### Annuity or Trust

■■ The crucial issue for determination is whether petitioners' transfer of

stock to the Bahamian trust was a sale in consideration for an annuity or a transfer to the trust with a reserved life estate in the income. If the transfer were a sale for an annuity promise, the tax savings would be substantial. When the transfer is a sale for an annuity promise, that part of the annuity constituting a recovery of the basis of the assets transferred by the annuitant is not taxable, and any amount received in excess of the adjusted base is taxed as a capital gain. On the other hand, where the transfer is in trust with a reserved life estate, all income received from the trust is taxed to the transferor. In addition, the transfer of property to a trust with a reserved life estate would subject the grantor to a gift tax on any remainder interest. The transfer of property in return for an annuity generally does not involve a gift tax assessment since the transfer is treated as a sale and there is usually no remainder interest.

■■ As structured, petitioners' plan affords the benefits of both a trust and an annuity. Nevertheless, as the Tax Court correctly noted, "petitioners were entitled to adopt an estate plan which would decrease the amount of the taxes they would otherwise owe, or avoid them altogether by any means which the law permits". The plan, however, must be consonant with the relevant principles of tax law. The decision depends upon "whether what was done, apart from the tax motive, was the thing the statute intended". Gregory v. Helvering, 293 U.S. 465, 469, 55 S.Ct. 266, 267, 79 L.Ed. 596 (1935). In determining whether petitioners have structured a valid annuity plan or have simply transferred property in trust and reserved a life estate therein, substance and not form is controlling. The essence of the arrangements "is determined not by subtleties of draftsman-

---

**8.** § 677(a) I.R.C.1954 provides:

"The grantor shall be treated as the owner of any portion of a trust, whether or not he is treated as such owner under section 674, whose income without the approval or consent of any adverse party is, or, in the discretion of the grantor or a non-adverse party, or both, may be—

(1) distributed to the grantor;
(2) held or accumulated for future distribution to the grantor."

If under section 677(a) the grantor is treated as the owner, section 671 specifies that he shall be taxed on the trust's income and shall be entitled to its deductions and credits.

ship but by their total effect". Commissioner v. P. G. Lake, Inc., 356 U.S. 260, 266–267, 78 S.Ct. 691, 695, 2 L.Ed.2d 743 (1958).[9]

■ In analyzing the arrangement created by petitioners and their advisor, the Tax Court concluded that the annuity agreement, the trust instruments, and the World Entertainer's note were all part of a prearranged plan. "No one of them would have been signed without the other; each was dependent upon the other." The court held, therefore, that all of the instruments must be considered together in determining whether or not a valid annuity agreement was made. We agree.[10] See O'Meara v. Commissioner, 34 F.2d 390, 394 (10 Cir. 1929) and In Estate of Cornelia B. Schwartz, 9 T.C. 229 (1947).

■ Construing the various instruments together, it was reasonable to conclude that in substance petitioners created a trust with a reserved life estate. The factors leading the Tax Court to this conclusion, set forth in more detail in its opinion, may be summarized as follows:

(1) The trust had no assets other than the $1,000 with which it was initially funded by petitioners and the note received as consideration for the sale of the N & V stock. In effect the only source of petitioners' "annuity" was property they had transferred to the trust—an arrangement more characteristic of a trust than a bona fide arms-length sale.

(2) Since the note was non-negotiable and could not be assigned, petitioners' "annuity" payments of $75,000 a year could not be paid out of the corpus of the trust.[11] The interest on the note, constituting the sole income of the trust, was exactly equal to the amount owing petitioners each year.[12]

(3) The corpus of the trust will remain intact for ultimate distribution to the beneficiaries "in precisely the same way as if petitioners had forthrightly cast the transaction in the form of a transfer in trust subject to a reservation of trust income".

(4) The arrangement did not give petitioners a down payment, interest on the deferred purchase price, or security for its payment—again more characteristic of a transfer in trust than a bona fide sale.

(5) There was a substantial disparity between the fair market value of the stock transferred and the actuarial value of the "annuity" payments.

While no one factor is controlling, together they support the conclusion of the Tax Court that petitioner transferred

9. As the Tax Court noted, " 'Technical considerations, niceties of the law of trusts or conveyances, or the legal paraphernalia which inventive genius may construct' must not frustrate an examination of the facts in the light of economic realities", quoting from Helvering v. Clifford, 309 U.S. 331, 334, 60 S.Ct. 554, 556, 84 L.Ed. 788 (1940). Moreover, special scrutiny must be given family transactions that purport to result in substantial tax savings. See Helvering v. Clifford, supra at 335, 60 S.Ct. 554; and Hill's Estate v. Maloney, 58 F.Supp. 164, 169 (D.N.J.1944).

10. The trust was created with the understanding that the trustee "would intend to dispose of the ownership of the shopping center almost at once". It was stipulated that, prior to the creation of the trust, World Entertainers was interested in buying the shopping center. The interest payments made by World Entertainers were equal to the payments that were to be made to petitioners by the trust under the "annuity" arrangement.

11. "It is well known that an annuity is calculated to yield a recipient who lives out his expectancy a total amount equal to the consideration paid, plus interest thereon. Hence, each annual payment, from the actuarial point of view, is made up partly of a return of capital and partly of income." George H. Thornley, 2 T.C. 220, 229 (1943), (quoting from Magill, Taxable Income (1936) p. 375), reversed on other grounds, 147 F.2d 416 (3 Cir. 1945). See also Igleheart v. Commissioner, 174 F.2d 605 (7 Cir. 1949).

12. As noted, supra (footnote 6), the trust's payments to petitioners were increased to a total of $105,000 per year beginning in 1968. The Tax Court concluded that this indicated a redetermination of the principal of the note, and that "the payments to petitioners could still be made from income. There is no reason to think that the redetermined price would be less favorable to the trust than the $3,000,000 plus regular interest of $75,000 received" on a subsequent sale of the property.

the stock in trust and reserved the income of the trust for life. This conclusion is supported by the In Estate of Cornelia B. Schwartz, *supra,* and Smith v. Commissioner, 56 T.C. 263 (1971). While these cases in some respects present different factual situations, in each case the sole corpus of the trust from which the "annuity" was to be paid consisted of property given by taxpayers to their children who in turn transferred it to the trust in which they were the ultimate beneficiaries. In *Smith* the taxpayers transferred an installment contract to their children. In holding that the assignment of the contract did not represent a bona fide "sale or exchange" the court said in part: "Rather, the evidence convincingly shows that they were simply component elements of an overall plan which embraced the trusts as well as the annuities—a plan that merely provided for periodic payments to petitioners during their lifetimes to be made out of the proceeds of the Union Oil contract, followed by disposition of the remainder to their children . . . all in accord with a carefully preconceived and integrated 'estate plan' . . . ." *Id.* at 286–287.[13]

In contending that the transaction constituted a valid sale and annuity arrangement, petitioners place great reliance on a footnote in Fidelity-Phila. Trust Co. v. Smith, 356 U.S. 274, 280, 78 S.Ct. 730, 733, 2 L.Ed.2d 765 (1958) which reads:

"Where a decedent, not in contemplation of death, has transferred property to another in return for a promise to make periodic payments to the transferor for his lifetime, it has been held that these payments are not income from the transferred property so as to include the property in the estate of the decedent. E. g., Estate of Sarah A. Bergan, 1 T.C. 543, Acq., 1943 Cum.Bull. 2; Security Trust & Savings Bank, Trustee, 11 B.T.A. 833; Seymour Johnson, 10 B.T.A. 411; Hirsch v. United States, 1929, 35 F.2d 982, 68 Ct.Cl. 508; cf. Welch v. Hall, 1 Cir., 134 F.2d 366. *In these cases the promise is a personal obligation of the transferee, the obligation is usually not chargeable to the transferred property, and the size of the payments is not determined by the size of the actual income from the transferred property, at the time the payments are made.*" (emphasis added.)

Petitioners claim they have followed "scrupulously" the formula laid down in this footnote and the cited cases.

If anything, the quoted language from *Fidelity-Phila. Trust,* particularly the last sentence, supports the conclusion of the Tax Court. The property transferred by petitioners comprised the sole assets from which the "annuity" could be paid. The obligation was in fact "chargeable to the transferred property"; and the size of the payments exactly equalled the actual income from the transferred property.

Nor do the five cases cited in *Fidelity-Phila. Trust* support petitioners' position. In none of these cases was property transferred to a trust as was done here. In *Hirsch,* for example, the decedent gave $50,000 in securities to each of his four children, who agreed to pay decedent's wife a specified annuity, or if decedent survived his wife to pay the annuity to him. The children were financially able to pay the annuity regardless of the securities transferred. Here, the trust is impecunious but for the interest payments by World Entertainers.

Petitioners argue that "by the established private-annuity precedents of Commissioner v. Kann (C.A. 3, 1949), 174 F.2d 357;[14] Lloyd v. Commissioner (1936) 33 B.T.A. 903, and Hill's Estate v. Maloney, Commissioner (D.C.1944) 58

---

**13.** *See also* Samuel v. C.I.R., 306 F.2d 682 (1 Cir. 1962) and Bixby v. Commissioner of I.R.S., 58 T.C. 757 (1972).

**14.** In *Kann's Estate,* the court assumed the validity of an annuity created by the decedent and considered only the tax consequences with respect to payments received pursuant to the agreement, although a dissenting opinion questioned the validity of the annuity.

F.Supp. 164, petitioners entered into a classic private annuity contract with a previously-created trust". These cases were distinguished by the Tax Court in its opinion, the court concluding:

"Those cases, each involving a disposition of property within a family group in return for a personal undertaking to make annual payments, provide a sharp contrast with the present one where an entity, the foreign trust, was created specifically to channel the World Entertainers' interest payments to petitioners. That a transaction is clothed with the paraphernalia of a so-called 'private annuity' does not exempt it from the same kind of hard legal analysis that any other type of transaction receives. And, for the reasons stated, we think the transaction here involved created a fiduciary relationship. Indeed, we think no private annuity would have been created even if, assuming all the other facts were the same, petitioners had made the transfer to their children and grandchildren rather than to a trust. In such circumstances, the children and grandchildren would have been mere conduits to petitioners, as was the trust in this case, of the interest paid by World Entertainers."[15]

Finally, petitioners contend that reversal is "particularly required" by United States v. Byrum, 408 U.S. 125, 92 S.Ct. 2382, 33 L.Ed.2d 283 (1972). Byrum, however, involved a totally different question. There the decedent had transferred stock in three corporations he owned to an irrevocable trust for the benefit of his children, reserving, however, the right to vote the stock, veto the transfer of the stock by the trustee, and remove and appoint trustees. The Commissioner claimed that because of these retained powers, the stock was includable in the gross estate of the decedent under 26 U.S.C. § 2036(a). The Court held that decedent had retained no right to control distribution by the trust and his "retention of voting control was not the retention of the enjoyment of the transferred property within the meaning" of § 2036. In essence the Court simply refused to accept the Commissioner's contention with respect to the substance of the trust. The Court in no way impaired the doctrine that substance and not form is controlling. After careful review of the record, we are convinced that in substance the petitioners, as held by the Tax Court, transferred stock to a trust and reserved a life estate in the income therefrom. Pursuant to 26 U.S.C. §§ 677 and 671, the petitioners are taxable on the income received from the trust.

### Gift Tax Liability

■ Having determined that the petitioners did not sell their interest in the shopping center stocks but rather simply placed them in trust with a reservation of income for life, we conclude that the defendants made a gift of the remainder to the trust beneficiaries. 26 C.F.R. § 25.2511—1(a).

Affirmed.

---

**15.** Estate of Becklenberg v. Commissioner, 273 F.2d 297 (7 Cir. 1959), upon which petitioners rely, is distinguishable. The right of the decedent to receive an annual payment by way of annuity or distribution from the trust "was not limited to the property transferred by her on the income therefrom". *Id.* at 301. Moreover, less than a third of the assets of the trust were traceable to the decedent.