Esther LAFARGUE, Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE, Appellee.

No. 80–7382.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 15, 1982.

Decided Oct. 6, 1982.

* The Honorable William G. East, Senior District Judge for the District of Oregon, sitting by

Harry Margolis, Los Gatos, Cal., for appellant.

John A. Dudeck, Jr., Washington, D. C., argued, for appellee; Richard Farber, Anthony Ilardi, Jr., Washington, D. C., on brief.

Before FLETCHER and CANBY, Circuit Judges, and EAST,* District Judge.

CANBY, Circuit Judge:

Taxpayer appeals from a decision of the Tax Court reported at 73 T.C. 40 (1979), and urges two errors. First, she contends that the court improperly characterized the transfer of her property to a trust. Second, she asserts that the Tax Court erred in striking an amendment to the pleadings concerning the Internal Revenue Service's method for selecting her income tax return for audit.

A complete statement of the facts is in the Tax Court's opinion. 73 T.C. at 41–50. The following is a basic summary intended only as an introduction. In 1971 Taxpayer established a trust with $100. The trust agreement provided for independent trustees and taxpayer's daughter was the named beneficiary. Taxpayer was neither a trustee nor a beneficiary under the terms of the trust. A few days after establishing the trust, taxpayer executed an Annuity Agreement with the trustees. Pursuant to that agreement she transferred property worth $335,000 to the trustees in exchange

designation.

for annual lifetime payments of $16,502. The property she transferred included non-income producing land, proceeds from the liquidation of a business, and assorted stocks and municipal bonds. The actuarial value of the $16,502 annuity was significantly less than the value of the property transferred, since the annuity amount was calculated without giving effect to any time discount factor. Both the initial creation of the trust and the subsequent transfer of the property were integral parts of a prearranged plan, the details of which were designed to minimize Taxpayer's tax liability.

The Tax Court characterized the $16,502 annual payments as distributions of trust income, taxable to the grantor under I.R.C. §§ 677(a)[1] and 671[2]. In the terms of § 677(a), Taxpayer was treated as the grantor of "a trust ... whose income ... is, or ... may be—(1) distributed to the grantor ... [or] (2) held or accumulated for future distribution to the grantor...." The alternative was to treat the original transfer of the property to the trust as a sale, perhaps with a gift component, and to view taxpayer as receiving the fixed annual payments in the capacity of an annuitant

and creditor of the trust, subject to the income tax provisions of I.R.C. § 72.

 The Tax Court's analysis is heavily dependent upon factual determinations. We cannot disturb these, absent clear error. We do not believe, however, that the facts are sufficient to justify the Tax Court's recharacterization of the transfer of the property. We are convinced that the annuity characterization comports with the formal structure of the transaction and accurately reflects its substance. The formal agreement concerning the transfer of Taxpayer's property to the trustees, reprinted in the Tax Court's opinion, 73 T.C. at 47–48, establishes her status as a creditor of the trust. She must transfer the property; in exchange, the trustees must pay her $16,502 annually. The $16,502 payments have been made each year and the payments have not fluctuated with the income of the trust. Thus the fundamental annuity obligation has not been ignored or modified. Under these circumstances, absent some indication that the annuity payment agreed upon is a mere disguise for transferring the income of the trust to the grantor, rather than a payment for the property transferred, we

1. I.R.C. § 677 states:
 (a) General rule
 The grantor shall be treated as the owner of any portion of a trust, whether or not he is treated as such owner under section 674, whose income without the approval or consent of any adverse party is, or, in the discretion of the grantor or a nonadverse party, or both, may be—
 (1) distributed to the grantor or the grantor's spouse;
 (2) held or accumulated for future distribution to the grantor or the grantor's spouse; or
 (3) applied to the payment of premiums on policies of insurance on the life of the grantor or the grantor's spouse (except policies of insurance irrevocably payable for a purpose specified in section 170(c) (relating to definition of charitable contributions)).
 This subsection shall not apply to a power the exercise of which can only affect the beneficial enjoyment of the income for a period commencing after the expiration of a period such that the grantor would not be treated as the owner under section 673 if the power were a reversionary interest; but the grantor may be treated as the owner after the expira-

tion of the period unless the power is relinquished.
 (b) [omitted]

2. I.R.C. § 671 states:
 § 671. Trust income, deductions, and credits attributable to grantors and others as substantial owners
 Where it is specified in this subpart that the grantor or another person shall be treated as the owner of any portion of a trust, there shall then be included in computing the taxable income and credits of the grantor or the other person those items of income, deductions, and credits against tax of the trust which are attributable to that portion of the trust to the extent that such items would be taken into account under this chapter in computing taxable income or credits against the tax of an individual. Any remaining portion of the trust shall be subject to subparts A through D. No items of a trust shall be included in computing the taxable income and credits of the grantor or of any other person solely on the grounds of his dominion and control over the trust under section 61 (relating to definition of gross income) or any other provision of this title, except as specified in this subpart.

cannot justify disregarding the formal structure of the transaction as a sale in exchange for an annuity. Accordingly, we reverse.

In reaching this conclusion, we have reviewed the factors considered by the Tax Court. We accept the Tax Court's conclusion that Taxpayer sold the property for less than she might have had the beneficiary of the trust been a stranger. But this factor does not alter the fundamental structure of the transaction as a sale in exchange for an annuity. At most it suggests that the transfer was partially a gift, *see Estate of Bell v. Commissioner,* 60 T.C. 469, 473 (1973), posing certain questions concerning the income tax ramifications of the transaction.[3]

The Tax Court also concluded that Taxpayer viewed herself as the beneficial owner of the property rather than as a creditor of the trust, on the basis of certain "informalities" in the administration of the trust and the transfer of the property to it. Particularly in the context of non-arm's length sales and trust arrangements, it is important to scrutinize whether the parties actually did what they purported to do in the formal documents. *Evans v. Commissioner,* 30 T.C. 798, 807 (1958). In the present case, such scrutiny is appropriate because the Trustees were friends of Taxpayer and Taxpayer's daughter was the beneficiary of the trust. But the "informality" the Tax Court found did not justify disregarding taxpayer's formal characterization of the entire transaction as a sale in exchange for an annuity. The Tax Court observed that the issuers of most of the transferred stock were not notified of the transfer until November 1973, and that as a result Taxpayer received approximately $2,200 in dividends each year during 1971, 1972, and 1973. The stock, however, represented only a fraction of the total property transferred and the Tax Court's decision did not confine itself to taxing Taxpayer on these dividends. We do not believe that a temporary defect in the transfer of this stock should serve as a basis for recasting the entire transaction from a sale or gift, taxable as such, to a transfer in trust. The Tax Court also observed that taxpayer did not assert her contractual right to a penalty when the annuity payments were a few months late. However, waiver of a late charge, without more, does not show that the trustees intended to ignore the fundamental contractual obligation to pay $16,502 annually, or that Taxpayer did not intend to enforce it. Finally, the Tax Court observed that Taxpayer expected to be kept informed on trust matters. Had she taken an active role in trust investment decisions or held some power to manage the trust or control the trustees, we might apply the rationale of *Bixby v. Commissioner,* 58 T.C. 757 (1972), or *Samuel v. Commissioner,* 306 F.2d 682 (1st Cir. 1962) (discussed *infra*).[4] But the

---

3. The Commissioner did not assess a gift tax deficiency, 73 T.C. at 52 n.8; therefore the gift tax ramifications of the transaction were not before the Tax Court. Nevertheless, on remand, the Tax Court may consider the income tax ramifications of the fact that no discount factor was used in the calculation of the annuity and the Commissioner's argument that the value of property transferred was therefore greater than the actuarial value of the annuity received in exchange. Basically, the Commissioner's argument that the transfer was part sale and part gift must be considered at two stages. First, it may be pertinent to determining the amount of any gain or loss realized on the transfer of the various properties, since a gift component may require an allocation of part of the taxpayer's basis in the property to the gift component of the transfer. Second, a gift component may affect the application of I.R.C. § 72 to the annuity payments received

by Taxpayer. *See 212 Corporation v. Commissioner,* 70 T.C. 788, 797–98 (1978); *Estate of Bell v. Commissioner,* 60 T.C. 469 (1973). Of course, if the Tax Court deals with these issues, it must also consider Taxpayer's fundamental contention that, since the annuity contract was unsecured, she will realize no gain on the sale until she has recovered her basis. *See* 73 T.C. at 51, and cases cited therein. *See generally Estate of Bell v. Commissioner,* 60 T.C. at 475, 476–80 (dissent); *Lloyd v. Commissioner,* 33 B.T.A. 903 (1936); *see also, Burnet v. Logan,* 283 U.S. 404, 51 S.Ct. 550, 75 L.Ed. 1143 (1931). We have not considered any of these issues and express no opinion on them.

4. Taxpayer's lack of control over the trust distinguishes *Bixby v. Commissioner,* 58 T.C. 757, 789–90 (1972), as well as *Samuel v. Commissioner,* 306 F.2d 682 (1st Cir. 1962), (discussed in text, *infra*). The "annuitants" in *Bixby* could

record demonstrates that Taxpayer was not well-informed concerning trust investments, did not take an active role in trust management, and held no power to manage the trust or in any way control the trustees. Thus the "informalities" considered by the Tax Court do not justify disregarding Taxpayer's characterization of the transaction as a sale in exchange for an annuity. Taken as a whole, the facts clearly show that the fundamental transfer and annuity obligations of the contract were being met, and that Taxpayer relinquished control over the property transferred.

The Tax Court concentrated its analysis on the factual similarities between the present case and *Lazarus v. Commissioner,* 58 T.C. 854 (1972), aff'd, 513 F.2d 824 (9th Cir. 1975). *See* 73 T.C. at 53. In *Lazarus,* as here, the taxpayers met with their advisor to devise a method for disposing of their assets for the benefit of their children, while minimizing tax consequences. Pursuant to a prearranged plan, they entered into a trust agreement establishing an irrevocable trust with independent trustees, and with their children as beneficiaries. The trust was funded with $1,000. Seven months later, as planned, they transferred their shopping center stock to the trust, under a formal "Annuity Agreement." The agreement entitled them to a joint and survivor "annuity" of $75,000 and the present value of the annuity was considerably less than the value of the property transferred. But this was not the end of the *Lazarus* plan. Almost immediately after transferring the stock, the trust sold it in exchange for a note. The note was then the *only* asset in the trust and just happened to yield $75,000 in interest income annually, exactly enough to pay the "annuity" payments to the taxpayers. The trust

contained no other income producing property and none of the income from the note could accumulate to provide for other trust investments. Since the note was non-negotiable and could not be assigned, there was no fund from which to collect the $75,000 "annuity" except for the annual interest on the note. The payment would consume the trust's income—no more, no less. It could never be paid out of the trust corpus.

Affirming the Tax Court, this circuit determined that to recharacterize the transaction was reasonable, 513 F.2d at 829, and agreed that the grantor had transferred the property to the trust retaining a life estate in the trust's income, rather than selling it to the trust in exchange for an annuity. *Id.* at 828, 831. Although the payment amount was fixed, as an annuity arising out of a sale would be, it was obviously a "mere conduit" for transmitting the income of the trust to the grantor, *see Lazarus* 58 T.C. at 870 & n. 16, and not a payment for the property transferred. Congress specifically provided for taxing such income reservations under I.R.C. § 677.

The fundamental rationale of *Lazarus* simply cannot apply to Taxpayer's annuity arrangement since the fixed annuity payments were not a conduit for the income of the trust.[5] In the case before us there was no evidence indicating that the payments are anything other than payments for the property transferred. There was no "tie-in" between the income of the trust and the amount of the annuity. 73 T.C. at 57. Certainly, in both the present case and *Lazarus,* there was a discrepancy between the fair market value of the property transferred and the actuarial value of the annuity the taxpayers received. But in the present case, this discrepancy was due to Taxpayer's failure to account for a time discount

---

serve on an "Advisory Committee" with plenary power over the assets of the trust. In addition, the trust instruments in *Bixby* permitted the "annuitant" settlor to remove the trustee and receive interest-free, unsecured loans from the trust and permitted the trust to pay premiums on the settlor "annuitant's" life insurance. 58 T.C. at 786.

5. The Commissioner cites the recent Tax Court decision in *Stern v. Commissioner,* 77 T.C. 614 (1981), for its statement that the tie between the amount of the annuity and the trust's income was not essential to the *Lazarus* decision. 77 T.C. at 641–42. In that particular passage of *Stern,* the Tax Court has simply reiterated the erroneous interpretation of *Lazarus* first given life in the Tax Court opinion that we review and reverse here.

factor, not an attempt to provide her with the income of the trust.

We also recognize that in both the present case and *Lazarus* the property the Taxpayers transferred constituted the bulk of the trust assets, and that the *Lazarus* opinion accorded significance to this factor. We believe, however, that in *Lazarus,* its principal effect was to bolster the court's determination that the annuity represented a reservation of trust income. The trust's only asset was a single note which was non-assignable and non-negotiable, so the interest income on the note was the only practical source for the "annuity" payment. 58 T.C. at 870–71; 513 F.2d at 829. In contrast to *Lazarus,* here the trust corpus was assessable for payment of the annuity, and, in fact, some corpus was used. In years when trust income exceeded the annuity amount the excess was available to the trustees for further investment or distribution to beneficiaries. The payment simply did not represent a camouflaged transfer of trust income, and the fact that the bulk of the trust's assets were obtained under the agreement has not been shown to have any practical or legal bearing on the trustee's obligation or ability to comply with the terms of the annuity contract. Under these circumstances, an otherwise valid sale and annuity agreement should not be disregarded for tax purposes.

The Tax Court also relied on *Samuel v. Commissioner,* 306 F.2d 682 (1st Cir. 1962), but we do not believe that it controls here. In *Samuel,* Archbishop Athanasius Samuel transferred the "Dead Sea Scrolls" to a trust for which he was a co-trustee. The original trust provided that all of the trust's income and 90% of the principal should be disposed of at Samuel's direction. Samuel also retained full power to amend and revoke the trust. The trust was subsequently amended to provide for payments to Samuel of $15,000 to reimburse him for the scrolls, $15,000 for his future expenses in connection with the scrolls, and an additional $10,000 per year. Samuel remained the co-trustee with the right to reduce the annual payments although the trust was no longer otherwise amendable or revocable.

All documents were formally cast as a trust agreement and the trust made no distributions to Samuel in years when there was no income. The court applied I.R.C. § 677(a) to the trust income, rejecting Samuel's argument that the payments to him should be regarded as "annuity" payments on his "sale" of the scrolls to the trust.

Several important factors distinguish the *Samuel* case from the instant one. First, in *Samuel* none of the documents supported Samuel's contention that a sale had occurred or that an annuity was intended or contemplated. 306 F.2d at 687. The court stated that in the context of a non-commercial annuity "conspicuously garbed in all of the external manifestations of a trust arrangement," " 'the instruments evidencing the agreement ought to spell out in detail the intent of the parties that there is contemplated an annuity venture.' " *Id.* Second, Samuel was also the trustee. As such, he was asserting a debtor-creditor relationship against himself. *Id.* Third, in his capacity as trustee he controlled the property, unlike the typical annuitant. *Id.* Fourth, the trust did not make the payments in years in which there was no income, which is uncharacteristic of a debtor-creditor relationship. *Id.* at 688. Clearly Samuel was a beneficial owner rather than an annuitant-creditor. His contention that the formal trust characterization should be ignored for tax purposes was unsupportable. But none of these factors are present in the instant case.

The present case involves a sales transaction of clearer substance than the one in *Lazarus* or *Samuel.* Not only did the formal documents reflect a sale in exchange for an annuity, but the annuity was not calculated to approximate or bear any mathematical relationship to the property's annual income, and the taxpayer, like a seller, did not actually continue to control the property sold. Taxpayer had traded certain property, with the management problems it presented, for a fixed life annuity. As in any sale, she would no longer share in the earnings of the property, its appreciation, or its actual management.

Her only right was to a fixed annual payment; subsequent gains in the property's value would inure to the trust, not Taxpayer. As with any annuity taken in exchange for property, the risk of Taxpayer's early death lay with the taxpayer, whereas the risk of Taxpayer's late demise lay with the trust and its trustees. In these circumstances, Taxpayer's formal characterization of the transaction as a sale in exchange for an annuity should not be disregarded for tax purposes.

The second issue raised by Taxpayer concerns the Internal Revenue Service's method of selecting and auditing her return. Precisely the same argument was rejected by this circuit in *Karme v. Commissioner,* 673 F.2d 1062 (9th Cir. 1982), and we reject it here.

The judgment is reversed in part and affirmed in part. The case is remanded for a determination of the income tax consequences attending the annual annuity payments and the sale of the property to the trust.[6]