**Sidney B. STERN and Vera L. Stern, Petitioners-Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

No. 83–7177.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 9, 1984.

Decided Nov. 15, 1984.

Enright, District Judge, sitting by designation, dissented with opinion.

Randall G. Dick, Suzanne Cutts Ritchie, Flynn & Steinberg, San Francisco, Cal., for petitioners-appellants.

Glenn L. Archer, Jr., Kenneth L. Greene, U.S. Dept. of Justice, Washington, D.C., for respondent-appellee.

Before SNEED and FLETCHER, Circuit Judges, and ENRIGHT,* District Judge.

SNEED, Circuit Judge:

Taxpayers appeal from a decision of the Tax Court, 77 T.C. 614 (1981), involving the taxable years of 1971, 1972, and 1973, and holding that transfers of common stock were not sales in exchange for annuities, but instead were transfers in trust subject to retained annual payments. We reverse.

## I.

## FACTS

A summary of the facts, which are more completely stated in the Tax Court's opinion, 77 T.C. at 616–36, follows. Acting on the advice of attorney Elliot Steinberg, taxpayers Sidney and Vera Stern decided in 1971 to transfer common stock to a foreign situs trust in exchange for an undertaking to pay to the transferors a private annuity. Taxpayers, who are husband and wife, sought thereby to obtain certain tax benefits.[1] Steinberg attempted to assure the foreign status of the trust by obtaining a foreign settlor and a foreign trustee. Peter Hylton, a Canadian attorney practicing in the Cayman Islands, and his law firm agreed to serve as settlors for the trust. Steinberg had a working relationship with World Banking Corp., Ltd. (Wobaco), a Bahamian bank. He arranged for Wobaco

Trust, Ltd., a wholly owned Bahamian subsidiary of Wobaco, to serve as trustee.

The plan was put into operation in September 1971, when Hylton signed a deed of settlement establishing an irrevocable trust (hereinafter referred to as the Hylton Trust) for the benefit of Sidney and Vera Stern and their children. Hylton and his law firm contributed $5000 to establish the trust. The deed of settlement authorized the trustee to lend money to the beneficiaries on an unsecured, interest-free basis and to distribute trust income or corpus to them. Sidney Stern had limited power of appointment over the corpus of the trust, but he could not appoint the assets to himself, his creditors, or the creditors of his estate. The trust instrument also allowed Sidney Stern to remove the trustee without cause, provided that he concurrently appoint a qualified successor trustee.[2]

Soon after the creation of the Hylton Trust, Sidney Stern met in San Francisco with Steinberg and a representative of Wobaco Trust to discuss the transfer of common stock owned by Sidney and Vera Stern to the trust in exchange for lifetime annuities. On October 14, 1971, taxpayers entered into a sales agreement with Wobaco Trust, the trustee of the Hylton Trust, by which they transferred common stock to the trust in exchange for a yearly single-life annuity of $222,757.01 for Sidney and a similar annuity of $27,216.85 for Vera. The annual payments were computed by dividing the fair market value of the stock by the appropriate annuity factor listed in Table A1 of Treas.Reg. § 20.2031–10(b). This agreement obligated the trust to pay the annual annuities without regard to the value of properties held by it or the amount

---

* Honorable William B. Enright, United States District Judge for the Southern District of California, sitting by designation.

1. The advantages sought by the sale of property to a foreign situs trust in exchange for an annuity include: (1) the receipt of a steady flow of income for the annuitant; (2) the deferred recognition of gain on the transferred property; (3) the potential removal of the property from the annuitant's gross estate; (4) the potential elimination of estate taxes on future appreciation of

the property; (5) the inapplicability of gift taxes or problems under I.R.C. § 2035 (transfers in contemplation of death); and (6) the potential ability of the foreign trust to accumulate income free of tax. *See* 77 T.C. at 616 n. 6.

2. The trust instrument required that the successor trustee be a company empowered to administer trusts and having authorized capital of at least $100,000 in Bahamian currency. 77 T.C. at 619 n. 10.

of income produced by the trust. The trust's liability, however, extended only to the assets it held; once those assets were exhausted, the trustee was not obligated to make further payments.

In 1972, Sidney Stern asked his father-in-law, Herbert Florcken, to establish a $1,000 trust for the benefit of Vera and their children. On May 17, 1972, Florcken executed a deed of settlement establishing such a trust with Wobaco Trust as trustee. The provisions of this trust (hereinafter referred to as the Florcken Trust) generally mirrored those of the Hylton Trust. The major differences were that the Florcken Trust named Vera and her children as the beneficiaries, and Vera held the limited power of appointment and the power to remove the trustee. On June 29, 1972, Sidney Stern agreed to transfer common stock to the Florcken Trust in exchange for a lifetime annual annuity of $227,924.33, computed in the same manner as was the Hylton Trust annuity. This agreement was supplanted by another agreement on September 15, 1972, which provided an annuity of $203,519.83 in exchange for the stock.

For purposes of calculating their income taxes, taxpayers treated the transfers of common stock to the Hylton and Florcken Trusts as sales in exchange for annuities in which no gain or loss is recognized as of the date of the transfer. They maintained that the transactions should be taxed in accordance with I.R.C. § 72, as interpreted by Rev.Rul. 69–74, 1969–1 C.B. 43. Taxpayers reported the payments received from the Hylton Trust in 1972 and 1973 in this manner.[3] The Tax Court rejected taxpayers' contention that the transfers were sales in exchange for annuities, and held that the transactions constituted transfers in trust with retained rights to annual payments. 77 T.C. at 640. Sidney and Vera Stern, the Tax Court held, were the true settlors of the two trusts. *Id.* at 647. Consequently, the Tax Court concluded that the entire income of the trusts is taxable to them under the grantor trust provisions of I.R.C. §§ 677(a) and 671.[4]

## II.

## DISCUSSION

We will not disturb the Tax Court's factual determinations absent clear error. *E.g., Lafargue v. Commissioner,* 689 F.2d 845, 846 (9th Cir.1982). The Tax Court's application of law to undisputed facts, however, is reviewable de novo. *Manocchio v. Commissioner,* 710 F.2d 1400, 1402 (9th Cir.1983). The issue in this case is whether the Tax Court correctly recharacterized the transactions as transfers in trust with retention of annual payments. This recharacterization is an application of law to established facts. It is, therefore, reviewable de novo.[5]

Our starting point must be our decision in *Lafargue,* in which a taxpayer also appealed from the Tax Court's recharacteriza-

---

**3.** During the years at issue, 1971–73, neither the Hylton Trust nor the Florcken Trust distributed any income or corpus to the trust beneficiaries as such. The Hylton Trust, as indicated, paid annuities to taxpayers in 1972 and 1973. Taxpayers received no annuity payments from the Florcken Trust during these years. 77 T.C. at 634.

**4.** I.R.C. § 677(a) provides that a grantor of a trust shall be deemed to own any portion of that trust whose income, without the consent of any adverse party or at the grantor's discretion, may be distributed to him or held for future distribution to him. A grantor treated as the owner of a trust under § 677 must include in income the income of the trust to the extent such income would be taken into account in computing individual income tax. I.R.C. § 671.

**5.** The Commissioner argues that *Thompson v. Commissioner,* 631 F.2d 642, 646 (9th Cir.1980), cert. denied, 452 U.S. 961, 101 S.Ct. 3110, 69 L.Ed.2d 972 (1981), establishes that the Tax Court's holding is subject to the clearly erroneous standard of review. *Thompson* applied this standard to Tax Court findings that certain transactions were a "sham." The Tax Court here expressly rejected the Commissioner's alternative argument that the annuity agreements were shams. 77 T.C. at 645. *Lafargue* indicates that we will review de novo the Tax Court's application of law in determining if a transaction should be recharacterized as a transfer to trust with retention of annual payments. *Cf. Zmuda v. Commissioner,* 731 F.2d 1417 (9th Cir.1984) (affirming Tax Court finding that foreign trusts were shams).

tion of an annuity transaction as a transfer in trust with retention of income. We reversed, and held that the formal structure and the substance of the transaction supported the taxpayer's contention that it was a sale in exchange for an annuity. We concluded that the annuity payments received by the taxpayer were not a mere conduit for transmitting the income of the trust. 689 F.2d at 848. We distinguished the case from *Lazarus v. Commissioner*, 513 F.2d 824 (9th Cir.1975), in which the "annuity payments" were "tied" to the income of the trust. In *Lafargue* there was no "tie-in" between the income of the trust and the amount of the annuity.[6] Payments from corpus were in fact made. 689 F.2d at 849. We acknowledged that the property transferred by the taxpayers constituted the bulk of the trust assets, and that the properly discounted value of the annuity at the time of the transfer was less than the value of the property transferred—a fact that created the distinct possibility that some corpus would be transferred to others on the annuitant's death. We noted, however, that these facts had not been shown to have any practical or legal bearing on the trustee's obligation or ability to comply with the terms of the annuity agreement. Under these circumstances, we concluded that the sale and annuity agreement in *Lafargue* should not be disregarded for tax purposes. 689 F.2d at 849.

■ We believe this case should be governed by *Lafargue* and not *Lazarus*. The Tax Court expressly found that the Hylton and Florcken Trusts were not mere conduits for the income to be derived from the transferred property. 77 T.C. at 641 & n. 49. Nonetheless, the Tax Court concluded that a tie between the amount of the annuity and the trust's income was not essential to its analysis in *Lazarus*. *Id.* at 641–42. We held it was in *Lafargue*, and we disapproved the Tax Court's interpretation of Ninth Circuit precedent. 689 F.2d at 848 & n. 5. Moreover, *Lafargue* indicates that

the transfers of common stock to the Hylton and Florcken Trusts may not be recharacterized merely because the transactions were part of a prearranged plan designed to minimize tax liability or because the transferred property constituted the bulk of the trust assets. *See id.* at 846, 849.

*Lafargue* does not hold that a transaction will be characterized as a sale in exchange for an annuity so long as the taxpayer follows certain formalities and the annuity is not tied to the trust income. We acknowledged that in the context of non-arm's length sales and trust arrangements, it is important to scrutinize whether the parties actually did what they purported to do in the formal documents. *Id.* at 847. Although in *Lafargue* there were certain "informalities" in the administration of the trust and the transfer of property to it, we concluded that they did not justify disregarding the taxpayer's formal characterization of the transaction as a sale in exchange for an annuity.

We recognized, however, that if the taxpayer had taken an active role in trust investment decisions or held some power to manage the trusts or control the trustees, the rationale of *Bixby v. Commissioner*, 58 T.C. 757 (1972), or *Samuel v. Commissioner*, 306 F.2d 682 (1st Cir.1962), might be applicable. In both *Bixby* and *Samuel*, the taxpayers effectively retained control and beneficial enjoyment of the property purportedly transferred to trusts. The control exercised in those cases, however, was much greater than that involved here. In *Bixby*, the "annuitants" could serve on an "advisory committee" with plenary power over the assets of the trust. Moreover, the trust instruments permitted the "annuitant" settlor to remove the trustee and receive interest-free, unsecured loans from the trust, and permitted the trust to pay premiums on the "annuitant" settlor's life insurance. The Tax Court concluded that the taxpayers had "avoided relinquishing

---

**6.** This fact, we held, distinguished *Lafargue* from *Lazarus* and made the rationale of the latter case inapplicable. 689 F.2d at 848; *Cf. Benson v. Commissioner*, 80 T.C. 789, 799 (1983)

(refusing in light of *Lafargue* to apply *Lazarus* in case in which annuity was not a conduit for trust income).

control over the stock and its proceeds," because "[t]hrough the advisory committee they continue to deal with property as before—with a free hand." 58 T.C. at 790.

The facts of *Samuel* were even less favorable to the taxpayer. There the trust provided that all of the trust's income and 90% of the principal should be disposed of at the taxpayer's discretion. The taxpayer also retained full power to amend or revoke the trust. The court rejected the taxpayer's contention that payments to him should be regarded as "annuity" payments for the "sale" of certain property to the trusts. None of the documents supported this contention. 306 F.2d at 687. As a trustee, the taxpayer, unlike an ordinary annuitant, controlled the property. Moreover, no payments were made in years in which there was no income. These circumstances, as we noted in *Lafargue*, 689 F.2d at 849, clearly established that the taxpayer was a beneficial owner rather than an annuitant-creditor.

■ Sidney and Vera Stern did not possess the degree of control over the trusts that the taxpayers possessed in *Bixby* and *Samuel*.[7] This was acknowledged by the Tax Court. *See* 77 T.C. at 645–46. The Tax Court noted that when arrangements were made in October 1971 to transfer common stock to the Hylton Trust, the parties contemplated that the trust would sell the stock and invest half the proceeds in a quoted security on the New York Stock Exchange. 77 T.C. at 621. This investment was to be "dealt with on the advice of Sidney Stern." *Id.* This plan, the Tax Court acknowledged, was never implemented. *Id.* at 644. Under the trust provisions, the trustee, not the taxpayers, controlled the investment of the trust assets. *See id.* at 618–21. Sidney Stern did propose investments to the Hylton Trust. *Id.* The trustee, however, followed this advice only once, and made a relatively small investment to facilitate Mr. Stern's reentry into the secondary loan business.[8] The Tax Court did not question Wobaco Trust's status as an independent trustee. *Id.* at 643. The Tax Court also noted that the taxpayers could remove the trustee without cause. *Id.* This power, however, was limited by the requirement that a qualified successor be appointed concurrent with the removal of the trustee. The taxpayers exercised this power in 1973, when they replaced Wobaco Trust with Canadian Imperial Bank of Commerce Trust Co. (Cayman), Ltd., as trustee. *Id.* at 634.

These events do not amount to a pattern of control by the annuitants sufficient to justify treating them as transferors of property to the trusts subject to retained annual payments from income or corpus. This conclusion is strengthened because the value of the annuities, unlike the annuity in *Lafargue*, equaled the fair market value of the stock exchanged therefor, as determined pursuant to the appropriate

---

7. It is true that in this case the trustee was authorized to make interest free loans to the beneficiaries, to guarantee their loans, to pay premiums on insurance policies covering their lives, and to distribute corpus or income to them. There was not, however, anything analogous to the "advisory committee" involved in *Bixby* and neither Sidney nor Vera Stern maintained a "free hand" over the disposition of the stock transferred to the trusts. We accept the Commissioner's argument that *Bixby* does not rest on the particular manner in which the taxpayer exerted control over the trust's assets. Nonetheless, we find that taxpayers in this case did not maintain control over the trusts' assets sufficient to disregard the formal structure of the transactions as sales in exchange for annuities.

8. In October 1972, the Hylton Trust invested $25,000 to acquire the stock of a finance company run by Sidney Stern. 77 T.C. at 628–29. The following April, Wobaco Trust sold the common stock held by the Hylton and Florcken Trusts for $4,354,132.71. *Id.* at 632. Thus, the $25,000 investment was insignificant relative to the corpus of the trusts.

The Tax Court also observed that Steinberg, who represented the taxpayers, proposed that the Hylton Trust refinance a $285,000 loan obtained from Wobaco's parent bank. $250,000 of the loan was used to make annuity payments, $25,000 was used to invest in the finance company, and $10,000 was used for administrative expenses. *Id.* at 628. The trustee authorized Steinberg to represent the trust in this matter, and the loan was refinanced at a lower interest rate with another bank.

Treasury Regulations. This reduced the chances that unexhausted corpus in relatively large amounts would pass to others on the death of the annuitants.[9]

■ There were also some informalities in the administration of the trusts. For example, the Tax Court observed that the trusts' investment counselor was hired and fired subject to Mr. Stern's approval [10] and that the Hylton Trust was moved to the Cayman Islands to satisfy the taxpayers. The Tax Court also noted that Mr. Stern listed the common stock transferred to the trusts as among his personal assets in an application for a California personal property broker's license and that an opinion letter obtained by the trusts' investment counselor stated that neither Mr. Stern nor Wobaco Trust had sold or attempted to sell the stock. 77 T.C. at 632, 645.

In *Lafargue*, there also were "informalities" in the administration of the trust and the transfer of property to it. 689 F.2d at 847. There the issuers of stock transferred to a trust were not notified of the transfer, and the taxpayer continued to receive dividends.[11] The taxpayer in *Lafargue* also did not assert her contractual right to a penalty when annuity payments

were late. Finally, the taxpayer requested to be kept informed on trust matters. Because the fundamental transfer and annuity obligations were being met and the taxpayer had relinquished control over the property transferred, we concluded that these "informalities" did not justify disregarding the formal structure of the transaction as a sale in exchange for an annuity.[12] A similar conclusion is appropriate here.

■ We conclude that this case, like *Lafargue*, is on the "taxpayer's side of the line." None of the elements examined—control of trust administration, beneficial enjoyment, and informality in trust administration—justifies a departure from *Lafargue*. Nor do the facts of this case, when considered together, indicate that we should put aside *Lafargue* and be guided by *Bixby* and *Samuel*.[13] Consequently, the Tax Court erred in recharacterizing the annuity transactions as transfers in trust with retention of income.

■ The Tax Court did not address the Commissioner's argument below that if the stock transfers were valid sales in exchange for annuities, the transactions

---

9. *See generally* Mathison, Lafargue v. Commissioner: *Using the Private Annuity as a Wealth Transfer Device*, Est., Gifts & Tr. J., July-Aug. 1983, at 13 (discussing tax implications of sale of assets to trust in exchange for a private annuity).

10. The hiring and firing of the investment counselor to manage a portion of the trusts' assets coincided with his employment to manage Sidney Stern's personal assets. The Tax Court found that Sidney Stern had maintained a "watchful eye" over the investment counselor's management of his personal account and the funds of the trusts. 77 T.C. at 633. Notwithstanding Stern's unsolicited advice, the investment counselor "made all the investment decisions for the accounts." *Id.*

11. We noted that the stock represented a fraction of the total property transferred to the trust and that the Tax Court's decision did not tax the taxpayers only on these dividends. 689 F.2d at 847.

12. In *Benson*, the Tax Court refused to recharacterize a trust-annuity arrangement similar to

those involved here, notwithstanding that the taxpayer had received advances on annuity payments and had not sought penalties for late payments, and the trust had made an interest-free loan to the taxpayer in violation of the trust instrument. In accord with the trust provisions, the trust had also distributed various sums of money to beneficiaries at the taxpayer's request. 80 T.C. at 798–99.

13. In *Lazarus*, we noted that no single factor controls the determination whether to recharacterize a transaction as a transfer in trust with retention of income, and we suggested that consideration of the totality of the relevant factors could justify a finding that purported "sales" were in fact transfers in trust. 513 F.2d at 829–30. *Lafargue* indicates that where there is no tie between the trust income and an annuity, the transaction should not be recharacterized as a transfer in trust unless the circumstances indicate that the taxpayers retain control or beneficial enjoyment of the trust assets. *Cf. Horstmier v. Commissioner*, 52 Tax Ct.Mem. Dec. (P-H) ¶ 83,409 (1983) (concluding that totality of circumstances distinguished case from *Lafargue* and indicated that transfer of property was not a sale in exchange for an annuity).

should be considered "closed" and the resulting gain must be recognized in the year of sale. The Tax Court shall consider this issue on remand.

REVERSED and REMANDED.

ENRIGHT, District Judge, dissenting:

I respectfully dissent. In my view, the majority decision would elevate form over substance in characterizing these transactions as sales in exchange for annuities rather than transfers in trust. In so doing, sanction is given to a troubling method of improper tax avoidance. In a time when the average individual struggles to meet his or her share of the tax burden, the wrong signal is sent to those who possess the means to circumvent the tax responsibilities we all must bear.

At the risk of reiterating facts already described by the Tax Court and the majority, it is important to highlight the essential features of the transactions at issue here.

With the goal of securing tax benefits as their admitted purpose, the Sterns, through their attorney, caused two foreign situs trusts to be established. As named beneficiaries of the trusts, the Sterns and their issue would receive payments from the trust corpus and income. Stern held a lifetime power of appointment over the trust, although he could not name himself, his creditors, or his estate. He could, however, appoint his wife, who was provided with an identical power effective at her husband's death. Most importantly, both Sterns had the power to remove the trustee, with or without cause, and could appoint a qualified successor.[1] The trustee was given broad powers to distribute trust funds to the beneficiaries, lend them money on an unsecured, interest-free basis, and to invest in common stock or securities with trust assets.

The record indicates that once Stern transferred his Teledyne stock to the trusts pursuant to the "annuity agreements," he continued to exercise considerable control over the trust assets. He made several investment proposals to the Hylton Trust and eventually convinced the trustee to invest $25,000 in trust funds to finance his reentry into the secondary loan business. He personally interviewed representatives from Weiss, Peck & Greer, the investment firm chosen to manage the trust assets. Upon Stern's subsequent recommendation, the trustee terminated the relationship with Weiss, and only hired a replacement after consulting with Stern. Eventually, Stern terminated the Hylton trustee and replaced them with an entity of his choice.

These facts must be analyzed in light of the two Ninth Circuit decisions which have attempted to distinguish annuity sales from transfers in trust, *Lazarus v. Commissioner*, 513 F.2d 824 (9th Cir.1975), and *Lafargue v. Commissioner*, 689 F.2d 845 (9th Cir.1982). In *Lazarus*, taxpayers acting in accordance with a pre-arranged estate plan, established an irrevocable trust with independent trustees and the taxpayers' children as the beneficiaries. They transferred stock to the trust pursuant to an "annuity agreement" which provided for an annual payment to the taxpayers of $75,000. The stock was sold in exchange for a note which was structured to yield $75,000 a year in interest income. The fact that the interest income of the trust was the sole source of the annuity payment, along with other factors "no one of [which] is controlling," led the court to hold that the transaction was properly characterized as a transfer in trust with a reserved life estate in the trust income. *Id.* at 829–30.[2]

1. The trust instrument required that the successor trustee have authorized capital of at least $100,000 in Bahamian currency.

2. The other factors listed in *Lazarus* are: 1) the note taken back in the stock sale was the only asset in the trust excluding the $1,000 used to initially fund the trust; 2) the corpus remained intact for the beneficiaries as it would in a normal trust arrangement; 3) the "sale" did not provide for downpayment, interest, or security for payment; and 4) there was a substantial disparity between the fair market value of the stock transferred and the actuarial value of the annuity payments. *Lazarus, supra,* at 829.

In *Lafargue*, this circuit reached the opposite result. There, the taxpayer established a trust with her daughter as the named beneficiary. The taxpayer was neither a trustee nor a beneficiary, and the court expressly stated that she held no power to manage the trust or control the independent trustees. *Id.* 689 F.2d at 848. She transferred property worth $335,000 in exchange for annual payments from the trust of $16,502. As the trust corpus was assessable for the annuity payments, there was no "tie-in" between the income of the trust and the payment to the taxpayer. The *Lafargue* court characterized the transaction as a sale in exchange for an annuity, rather than a transfer in trust. *Id.* 689 F.2d at 848.

In ruling in favor of the taxpayer, the *Lafargue* court focused on much more than whether the annuity payments were a "mere conduit" for the trust income.[3] The court listed several factors which highlight the distinctions between that decision and the case at bar.

First, *Lafargue* indicates that had the taxpayer there exercised control over the trust assets or trustees, the court might have applied the rationale of *Bixby v. Commissioner*, 58 T.C. 757 (1972), or *Samuel v. Commissioner*, 306 F.2d 682 (1st Cir.1962). In both *Bixby* and *Samuel*, the taxpayers exerted such a high degree of control over the assets purportedly transferred to trusts that the transactions could not be characterized as sales in exchange for annuities. By way of example, *Lafargue* notes that the "annuitant" settlor in *Bixby* could remove the trustee and receive interest-free, unsecured loans from the trust. *Lafargue, supra*, at 848–49, n. 4.

Mr. Stern enjoyed precisely this type of control over his trust assets, together with other significant incidents of ownership.

Under his power of appointment, he could transfer the trust to his wife or anyone else, save himself or his creditors. He held the power to terminate the trustee without cause, a power he eventually exercised in replacing the Hylton trustee.

At least one court has viewed the power to terminate without cause as the functional equivalent of being the trustee. *Corning v. Commissioner*, 24 T.C. 907, 915 (1955). Stern exercised considerable control over the management of the trust assets, as evidenced by his selection and termination of the trust's investment counselor.

Short of actually holding the Teledyne stock in his own name, it is difficult to conceive of an arrangement whereby Stern would enjoy greater control over the assets he purported to transfer away. Indeed, on at least one occasion, he represented that those assets were his own.[4]

The second factor which distinguishes this case relates to the Sterns' status as co-beneficiaries of the trust. The *Lafargue* court supported its decision in favor of the taxpayer by noting that subsequent gains in the trust property would inure to the trust, rather than Mrs. Lafargue, who was *not* named as a beneficiary. Hence, the early risk of death lay with the taxpayer, as it would in a normal annuity situation. *Lafargue, supra*, 689 F.2d at 850.

In contrast, the Sterns face none of the risks normally borne by an annuitant. As beneficiaries, they will reap any increases in the trust corpus. More importantly, they are insured against the risk of early death as the residue of the trust is held for their benefit. The majority's observation that there is little chance of unexhausted corpus passing to others upon the death of the annuitants misses the point. It makes little difference to the Sterns if the accu-

---

**3.** The majority's reading of *Lafargue* unduly limits the range of factors considered in that case and in *Lazarus*. While *Lafargue* indicates the "mere conduit" test is an important factor, *Id.* at 848, n. 5, the extended discussion of the taxpayer's control (or lack thereof) over trust assets indicates the tie-in test is not determinative of the issue.

**4.** After the transfer of the Teledyne stock to the Hylton Trust, Stern listed those shares as among his personal assets in an application for a California personal property broker's license. 77 T.C. 614, 632 (1981).

mulated value of their annuity payments approximates the fair market value of the stock transferred. Any unexhausted payments resulting from their premature deaths will pass to the surviving spouse or some other beneficiary they have named. Given this arrangement, Sidney and Vera Stern are more appropriately characterized as beneficial owners rather than annuitant-creditors. *Lafargue, supra,* 689 F.2d at 849; *Samuel, supra,* 306 F.2d at 687.

In conclusion, I find based on the degree of control and the beneficial enjoyment afforded over the trust assets, these transactions must be characterized as transfer in trust rather than sales in exchange for annuities. I would further find, based upon the same factors, the Sterns are the true settlors of the trusts and should be taxed under I.R.C. §§ 677(a) and 671. I would affirm the decision of the Tax Court.