AUGUST WAEGEMANN AND BARBARA WAEGEMANN, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Waegemann v. Commissioner
Docket Nos. 1026-90, 3116-91, 22809-91, 27414-91
United States Tax Court
T.C. Memo 1993-632; 1993 Tax Ct. Memo LEXIS 644; 66 T.C.M. (CCH) 1808; December 28, 1993, Filed *644 Decision will be entered under Rule 155. For petitioners: Donald Del Grande. For respondent: Mary E. Wynne and Cynthia K. Hustad. CLAPP
CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION CLAPP, Judge: Respondent determined deficiencies in petitioners' Federal income taxes and additions to tax as follows: Docket No. 1026-90 -- August and Barbara Waegemann: Additions to Tax
Sec.
Sec.
Sec.
Year
Deficiency
6653(a)(1)(A)
6653(a)(1)(B)
6661
1984
$ 8,014,315
$ 402,066
[1]
$ 2,010,329
1985
2,262,052
113,103
[2]
565,513
Docket No. 3116-91 -- Global, Inc.
Additions to Tax
Sec.
Sec.
Sec.
Sec.
Sec.
Year
Deficiency
6653(a)(1)
6653(a)(2)
6653(a)(1)(A)
6653(a)(1)(B)
6661
1985
$ 280,167
$ 14,008
[1] --  --
$ 70,042
1986
314,185
--
--
$ 15,709
[2]
78,546
1987
884,045
--
--
44,202
[3]
221,011
Docket No. 22809-91 -- August E. and Barbara A. Waegemann Additions to Tax
Sec.
Sec.
Sec.
Year
Deficiency
6653(a)(1)(A)
6653(a)(1)(B)
6661
1986
$ 1,364,057
$ 68,203
[1]
$ 341,014
*645 Docket No. 27414-91 -- August E. and Barbara A. Waegemann Additions to Tax
Sec.
Sec.
Sec.
Year
Deficiency
6653(a)(1)(A)
6653(a)(1)(B)
6661
1987
$ 522,730
$ 26,137
[1]
$ 130,683
Respondent also determined that all of the deficiencies were due to tax-motivated transactions and, therefore, petitioners in each of these cases are liable for additional interest under section 6621(c), formerly section 6621(d), for each of the years at issue. After concessions by the parties, the issues for decision are: (1) Whether August and Barbara Waegemann (petitioners) are entitled to deduct interest paid in 1984 and 1985 on purported loans secured by plantations in Vanuatu. We hold that they are not. (2) Whether petitioners are entitled to deduct in 1984 and 1985 depreciation on plantations in Vanuatu. We hold that they are not. (3) Whether certain items of income of Global, Inc. (Global), for the years 1984, 1985, 1986, and 1987 should be included in petitioners' taxable income for those years. We hold that they should. (4) Whether petitioners are entitled to deduct partnership losses in 1984 in connection *646 with Union Square Development Co. (USDC). We hold that they are not. (5) Whether a purported loan of $ 320,000 from Beneficial Mortgage Co. B.V. (Beneficial) to petitioners should be included in petitioners' taxable income for 1984. We hold that it should. (6) Whether petitioners are entitled to deduct interest purportedly paid to Beneficial in 1985. We hold that they are not. (7) Whether petitioners are entitled to deducted interest purportedly paid to San Martine Properties of Amsterdam B.V. (San Martine) in 1984 and 1985. We hold that they are not. (8) Whether certain items of income of International Marketing, Ltd. (IML), for the years 1984, 1985, 1986, and 1987 should be included in petitioners' taxable income for those years. We hold that some items should and some items should not. (9) Whether certain items of income of Denver Investors Development, Ltd. (Denver Investors), for the year 1984 should be included in petitioners' taxable income for that year. We hold that they should. (10) Whether all or part of a $ 713,000 purported loan from Eurofinance B.V. (Eurofinance), to Consolidated Mining Co. (CMC) should be included in petitioners' taxable income for 1984. *647 We hold that it should. (11) Whether petitioners are entitled to a $ 385,402 net operating loss carry forward to 1984. We hold that they are not. (12) Whether petitioners are entitled to an $ 18,165 investment interest deduction for 1986. We hold that they are not. (13) Whether petitioners are liable for increased interest under section 6621(c), formerly section 6621(d), for 1984, 1985, 1986, and 1987. We hold that they are. (14) Whether petitioners are liable for additions to tax under section 6653(a)(1) and (2) for 1984 and 1985, and under section 6653(a)(1)(A) and (B) for 1986 and 1987. We hold that they are. (15) Whether petitioners are liable for additions to tax under section 6661 for 1984, 1985, 1986, and 1987. We hold that they are. (16) Whether Global is entitled to interest expense deductions of $ 254,800, $ 413,380, and $ 3,044 for the years 1985, 1986, and 1987, respectively. We hold that it is not. (17) Whether Global is entitled to depreciation deductions of $ 223,894, $ 231,577, and $ 233,940 for the years 1985, 1986, and 1987, respectively. We hold that it is not. (18) Whether Global is entitled to net operating loss carryforwards of $ 90,365, $ 424,878, *648 and $ 682,553 for the years 1985, 1986, and 1987, respectively. We hold that it is not. (19) Whether Global had additional income of $ 114,00 from the sale of a carwash in 1986. Given our holding with respect to petitioners, we hold that it did not. (20) Whether Global had additional income of $ 1,974,900 for forgiveness of indebtedness in 1987. We hold that it did. (21) Whether Global is liable for increased interest under section 6621(c), formerly section 6621(d), for 1985, 1986, and 1987. We hold that it is. (22) Whether Global is liable for additions to tax under section 6653(a)(1) and (2) for 1985 and under section 6653(a)(1)(A) and (B) for 1986 and 1987. We hold that it is. (23) Whether Global is liable for additions to tax under section 6661 for 1985, 1986, and 1987. We hold that it is. All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated. FINDINGS OF FACT We incorporate by reference the joint stipulation of facts, the first through twelfth supplemental joint stipulations of facts, and the attached exhibits. At the time *649 the petitions in these cases were filed, petitioners were residents of Hillsborough, California, and Global had its principal place of business in San Rafael, California. The Entities
In mid-1977, August Waegemann (petitioner) approached Quentin L. Breen (Breen), a California tax attorney, to undertake tax planning for him and his family. The tax planning included the establishment of foreign situs trusts to act as holding companies for foreign corporations. The trust structure was designed, in part, to ensure that any corporation owned by the trusts would not be considered to be a controlled foreign corporation or a foreign personal holding company. In order to implement the plan suggested by Breen, petitioner's aunt, Emilie W. Mitchell, established three trusts. One trust was the Emilie Mitchell Trust, a Bermuda trust established November 18, 1977. The Bank of Bermuda was the trustee and the initial corpus was $ 1,000. The beneficiaries were petitioners, petitioners' daughter and grandson, Clarise A. and Bryan C. Blanchard, the issue and heirs of petitioners, the John Birch Society, and all organizations qualified under section 501(c)(3). Petitioner served as trust *650 protector for the Emilie Mitchell Trust, with the power to remove the trustee and appoint a new trustee, provided the new trustee met certain qualifications. The second trust was also a Bermuda trust established November 24, 1977, and called the Free Enterprise Foundation (FEF). The beneficiaries of FEF were charitable organizations recognized under the laws of Bermuda. The Bank of Bermuda was the trustee and the initial corpus was $ 10. Petitioner was the trust protector of FEF until he resigned in 1986, at which time his daughter became trust protector. The third trust was the Brandywine Charitable Trust (Brandywine), a British Virgin Islands trust established February 24, 1981. The beneficiaries of Brandywine were charitable organizations that satisfied the requirements of section 501(c)(3). The trustee was the Caribbean Trust Co. and the initial corpus was $ 50,000. Petitioner was the trust protector of Brandywine until he resigned in 1986, at which time his daughter became trust protector. As trust protector of FEF and Brandywine, petitioner had essentially the same power to remove and replace the trustee as he had for the Emilie Mitchell Trust. The Bank of Bermuda, *651 as trustee for the Emilie Mitchell Trust and FEF, held 499 of the 500 outstanding shares of Sphinx Enterprises Ltd. (Sphinx) stock. Sphinx was a British Virgin Islands corporation formed by George B. Mitchell (Mitchell), an unrelated person, on September 7, 1977. Mitchell owned the remaining share of Sphinx stock. Sphinx owned 100 percent of Societe Agricole Hebraise (SAH), an unregistered New Hebrides corporation, 100 percent of Rowley Properties, Inc. (Rowley), a Panama corporation, and 100 percent of IML, a British Virgin Islands corporation. Prior to September 7, 1982, Sphinx transferred its interests in SAH, Rowley, and IML to Evansville Insurance Co., Inc. (Evansville), a Panama corporation. Once it had transferred all of its assets, Sphinx ceased operations and redeemed its outstanding shares. Evansville was originally a wholly owned subsidiary of Sphinx. In October 1982, Sphinx assigned its interest in Evansville to FEF. Brandywine was the sole owner of Bray Trading Co., Ltd. (Bray Trading), a Hong Kong corporation. Global was a wholly owned subsidiary of Bray Trading. Global was incorporated in Nevada in February 1982. Brandywine also owned Alabaster, Inc. and *652 B. Benreed Investment, Ltd. (B. Benreed). B. Benreed was incorporated in Hong Kong and was the sole shareholder of Denver Investors, a Colorado corporation. Also involved in some of the transactions at issue were partnerships in which petitioner was a partner. USDC was a Colorado general partnership formed for the purpose of developing property in Lakewood, Colorado (the Lakewood property). Petitioner and Sam Miller (Miller) were each 50-percent partners in USDC. Union Square Sales Co. (USSC) was another partnership owned by petitioner and Miller which participated in the purchase and development of the Lakewood property. Petitioner and Miller were also 25-percent partners in CMC from March 1983 until October 1984. The other partner of CMC was Claude Lee (Lee). In addition, various foreign financing companies participated in some of the transactions at issue. These included San Martine, New World Properties, B.V. (New World), Beneficial, and Eurofinance, all Netherlands companies; Sun Tak Shun Finance, Ltd. (Sun Tak Shun), a Hong Kong company; and Hong Kong Shanghai Finance Group (HKSFG), a Bahamas company. New Hebrides Plantations Transaction
Sometime in late 1977 *653 or early 1978, petitioners became interested in acquiring plantations in New Hebrides. Petitioner consulted the Alexander & Baldwin Agribusiness Corp. (Alexander & Baldwin) regarding the earnings and development potential of a plantation (My plantation) owned by Jean My (My). Petitioner also considered hiring Alexander & Baldwin to manage the plantation, but chose not to pursue that course because of the monetary investment that would have been required. Petitioner negotiated with My for the purchase of his plantation, and the sale was completed on April 29, 1978. The agreed sale price was $ 590,000, consisting of a cash downpayment of $ 150,000 and a $ 440,000 note. The note was payable in two installments: $ 240,000 due April 30, 1979, and $ 200,000 due April 30, 1980. Petitioner and My later negotiated a $ 100,000 increase in the sale price which petitioner paid on June 4, 1979. The sale of the My plantation was structured as a sale to Sphinx with title held by Societe Civile Sarami. On May 1, 1978, Sphinx signed a lease agreement with SAH giving SAH a 10-year lease on the My plantation. The lease payments were $ 154,000 for the first 4 years and $ 200,000 for the remaining *654 6 years. Sphinx also encumbered the My plantation with a mortgage securing a $ 1,400,000 loan from New World on May 22, 1978. Under the terms of the loan, Sphinx was to make interest payments of $ 154,000 for the first 4 years and $ 200,000 for the remaining 6 years. The principal balance was due after 10 years. Those terms were very similar to the terms of a $ 1,400,000 loan Sphinx had made to New World on May 1, 1978. The final stage of petitioners' plan to acquire the My plantation was an exchange agreement between Sphinx and petitioners. Sphinx agreed to transfer its interest in the My plantation subject to the New World loan and the lease, and petitioners agreed to transfer their interests in various properties in California subject to certain leases and loans. The transfer of interests purportedly occurred on May 22, 1978. On that date, petitioners also signed an assumption of the New World loan. In mid-1978, petitioners decided to purchase a second plantation in New Hebrides (Maile plantation) owned by Societe Civile D'Aores (SCDA) which was wholly owned by Dr. and Mrs. James Stakely (the Stakelys). The process of acquiring the Maile plantation was very similar to *655 the My plantation acquisition. Petitioner negotiated a $ 250,000 sale price for the Maile plantation and the sale occurred on September 11, 1978. The sale of the Maile plantation was structured as a transfer of the Stakelys' ownership rights in SCDA to Sphinx for $ 250,000, followed by a transfer of Sphinx's rights in SCDA to petitioners purportedly in exchange for petitioners' interest in a certain shopping center in Reno, Nevada. A portion of the purchase price was financed by a $ 150,000 loan from Commercial Bank of Australia (CBA) to SCDA and petitioners. The loan was secured by a mortgage on the Maile plantation. Sphinx was not a party to the CBA loan. In anticipation of the Maile plantation transfer, Sphinx leased the plantation to SAH for 10 years beginning August 15, 1978. The lease payments were $ 75,000 per year. In addition, on September 1, 1978, New World loaned Sphinx $ 650,000 secured by a mortgage on the Maile plantation. Under the terms of the loan, Sphinx was to make interest payments of $ 78,000 for the first 4 years and of $ 100,000 for each year thereafter. The principal balance was due after 10 years. The terms of the loan from New World to Sphinx were *656 very similar to the terms of a $ 650,000 loan from Sphinx to New World made on the same day. When the Maile plantation was transferred to petitioners, they took the property subject to the lease to SAH and to the loan from New World. Although the plantations were purportedly leased by SAH, petitioner controlled their operations. He installed his daughter and son-in-law (the Blanchards) as managers of the plantations and received detailed accountings of operations. In addition, petitioner participated in contract negotiations related to plantation operations and made personnel decisions. In 1980, New Hebrides gained its independence and changed its name to Vanuatu. The new Government of Vanuatu nationalized all agricultural property owned by nonresidents and placed petitioners on the undesirable aliens list. Petitioner continued to operate the plantations through various managers and tried to convince the Government of Vanuatu that the property should be returned to its rightful owners. However, petitioner eventually liquidated the plantations to the extent he could and stopped making payments on the notes held by My and CBA in 1981 and 1982, respectively. Petitioners continued *657 to make the interest payments on the New World notes until 1985 and deducted those payments on their Federal income tax returns. Petitioners also deducted depreciation on the plantations on their Federal income tax returns until 1985. Crestview, Stockton, San Francisco and Raleys Transactions
Petitioners owned a 50-percent interest in a shopping center in Watsonville, California, called "Crestview". Earl Tom Pyle (Pyle) owned the other 50 percent. Petitioners also owned 50-percent interests in two parcels of real property in San Francisco (the San Francisco property) in which Pyle was the other 50- percent owner and a 100-percent interest in a parcel of real property in Stockton, California (the Stockton property). In August 1978, petitioners transferred legal title to Crestview and the San Francisco and Stockton properties to San Francisco Land & Title Co. (San Francisco L & T) pursuant to a holding agreement in which San Francisco L & T agreed to hold title to the properties for the benefit of petitioners. In addition, petitioners owned 49 percent of a shopping center in Reno, Nevada, called "Raleys". Two corporations that were wholly owned by petitioners owned 29 *658 percent of Raleys and unrelated third parties owned the remaining 22 percent. In August 1978, petitioners and their wholly owned corporations transferred legal title to their interests in Raleys to Reno Land & Title Co. (Reno L & T) pursuant to a holding agreement in which Reno L & T agreed to hold title to the property for the benefit of petitioners and their wholly owned corporations. On May 22, 1978, petitioners instructed San Francisco L & T to hold Crestview and the San Francisco and Stockton properties for the benefit of Sphinx. The transfer of beneficial title was purportedly effected in exchange for the transfer of the My plantation from Sphinx to petitioners under an agreement effective October 10, 1977. Similarly, on October 9, 1978, petitioners instructed Reno L & T to hold Raleys for the benefit of Sphinx pursuant to an agreement between petitioners and Sphinx effective June 26, 1978. Under the agreement, petitioners purportedly agreed to exchange their interest in Raleys for Sphinx's interest in the Maile plantation. Despite the purported transfer of Raleys, Crestview, and the San Francisco and Stockton properties to Sphinx, petitioners continued to hold themselves *659 out as the owners of those properties and continued to exercise control over them. Neither the county recorder's office nor the county assessor's office was ever informed about the change in ownership of Crestview. In 1979, Union Oil Co. of California sent petitioner a tax questionnaire and a letter asking petitioner to forward the questionnaire to the new owner if the property had changed hands. Pyle responded to the inquiry with a letter stating that the property was still under the same ownership. During 1981 and 1982, in a suit with Montgomery Ward, petitioners filed a complaint in which they indicated that they were the lessors on the Crestview lease to Montgomery Ward, and petitioner testified in a deposition and in court that he owned Crestview. In addition, petitioner continued to sign leases on the property and listed the property as personal assets on financial statements he provided to various banks. Until after 1988, all of the income from Raleys, Crestview, and the San Francisco properties was deposited into accounts on which petitioners had sole signatory authority. In 1982, Sphinx purportedly sold its interests in Raleys, Crestview, and the San Francisco properties *660 to Global. The initial deposit on the sale to Global was paid by Bray Trading from funds which had come from USSC through New World, Rowley, and Brandywine. A portion of the money used to finance Global's purchase of the property came from a purported loan between Global and Sun Tak Shun arranged by Eurofinance. The funds for the loan originated with Brandywine and passed through Bray Trading to Sun Tak Shun. None of the entities involved in the purported financing ever recorded a mortgage against Raleys, Crestview, or the San Francisco properties. Money from Global was sent offshore in the form of payments on the loan from Eurofinance; however, the funds were sent back onshore again in the form of loans to USDC. Even after the purported transfer of Raleys, Crestview, and the San Francisco properties from Sphinx to Global, petitioners continued to hold themselves out as the owners of those properties. In 1982, petitioner, without consulting anyone, made the decision not to sell Raleys to the minority owners. Acting as lessors, petitioners signed a November 27, 1984, lease termination agreement on the portion of Crestview leased to the Bank of America. Both San Francisco L *661 & T and Reno L & T continued to consider petitioners to be the owners of Raleys, Crestview, and the San Francisco properties. As late as 1988, petitioner signed, as the owner of Crestview, an application for environmental review with the city of Watsonville. Moreover, petitioner controlled Global's operations and was the only one who gave Global's president instructions regarding Global's income and operations. In the summer of 1989, Global purportedly sold Raleys to a third party and Crestview to Pyle, claiming a loss on both sales. Money from the sale of Raleys was paid into petitioners' bankruptcy estate. Additionally, Global paid petitioners' legal fees for their bankruptcy proceeding. The remainder of the purchase price for Raleys and the entire purchase price for Crestview were transferred offshore. Lakewood Property Transactions
Petitioner and Miller formed USDC in 1979 for the purpose of purchasing and developing the Lakewood property. Prior to the written agreement petitioner and Miller operated the business as Union Square Land Co. The property was appraised at approximately $ 14 million as it was and $ 17 million if certain changes were made. On April 5, 1979, Miller *662 signed an option contract to purchase the Lakewood property for $ 7 million and paid $ 350,000 into an escrow account toward the purchase. Under the option contract, the sale was to close on October 1, 1979. On September 26, 1979, the closing date was extended to October 10, 1979. In March 1979, petitioner and Miller, for Union Square Land Co., entered into an agreement with Rowley to negotiate the purchase of the Lakewood property for Rowley. Petitioner and Miller also arranged financing for the purchase from various sources, including simultaneous sales of portions of the property. On October 18, 1979, the sale was completed, and Denver Land and Title, a subsidiary of Rowley, took title to the Lakewood property for the benefit of Rowley. On that same day, New World purchased the Lakewood property from Rowley for $ 13,500,000. New World gave Rowley a note for $ 12,659,083 at 17-7/8 percent interest with no payments due for 3 years. Also on the same day, New World sold the Lakewood property to USSC for $ 13,500,000. USSC gave New World a note for $ 12,659,083 at 18-percent interest with no payments due for 3 years. At all times, Denver Land and Title continued to hold legal *663 title to the Lakewood property. In 1984, USDC [2] sold portions of the Lakewood property that had been developed. In calculating the gains on the sales, USDC computed the bases using prorated portions of $ 13,500,030 as the initial bases. Also in 1984, a circular flow of funds occurred, in which payments made by USDC on its loan from New World were routed through various entities and funneled back through Beneficial to USDC. USDC filed a partnership return for 1984 reporting a loss of $ 1,695,107. Petitioner's Schedule K-1 assigned $ 847,553 of that loss to him. House Loans
In July 1978, petitioners received a loan of $ 180,000 from Sphinx through San Martine. The note provided for annual payments of $ 19,800 until December 31, 1984, at which time the remaining principal and accrued interest were due. *664 The loan was secured by petitioners' house in Hillsborough, California. The loan structure was designed to keep the economic consequences within the family group and to take advantage of the tax treaty between the United States and the Netherlands. The loan was fully paid with proceeds from another loan in June 1984. In January 1980, petitioners received another loan from Sphinx through San Martine. The loan was for $ 200,000, and under the terms of the note, petitioners were to make annual payments of interest at 15 percent until December 31, 1984, at which time the principal and any accrued interest were due. The loan was secured by petitioners' house in Hillsborough, California, which was valued at $ 400,000. Including the $ 200,000 loan, on March 11, 1980, there were liens recorded against petitioners' house totaling $ 509,380.30. No principal payments were ever made on the loan and interest payments were no longer made after 1985. Neither San Martine nor Sphinx (or its successor Evansville) ever instituted foreclosure proceedings on petitioners' house. In June 1984, petitioners received a $ 320,000 loan from Beneficial which was also secured by their house. The note *665 provided for annual interest payments of 15 percent until December 31, 1984, at which time the principal and any accrued interest were due. Again, no principal payments were ever made, and no interest payments were made after 1985. Nevertheless, Beneficial never instituted foreclosure proceedings. The money used to fund the San Martine loans and petitioners' payments on all of the house loans went through a series of circular transactions from petitioners to various offshore entities and back to petitioners or petitioner's partnership, USDC. International Marketing Limited
Petitioners owned a note executed by Matteo Aiello and Robert V. LoForti (the LoForti note) in the original amount of $ 189,000. Petitioners also owned a note executed by Nobuko D. and James W. Washington (the Washington note) in the original amount of $ 7,475. On May 1, 1984, petitioners sold the LoForti note and the Washington note to IML for the face amounts of the notes. At that time, the principal balance of the LoForti note was $ 138,657 and the principal balance of the Washington note was $ 4,685. On June 5, 1984, petitioner informed the borrowers on the notes that he had sold the notes and *666 all future payments should be sent to IML. IML made a demand for full payment of the Washington note on September 19, 1984, and sold the LoForti note to the Blanchards on July 1, 1990, for $ 45,000, $ 26,000 less than the face amount of the note. Petitioners also owned one-half interests in an oil and gas lease in Ellis County, Kansas (the Staab oil lease), in a note secured by a deed of trust on real property in San Francisco, California (the Jackson note), and in a note secured by a security agreement (the Cassidy note), all of which petitioners sold to IML on May 1, 1984. The sale price for those assets was $ 225,000. On May 26, 1984, petitioner informed Pyle, the other one-half owner of the Staab oil lease, that he had sold his interest in the lease to IML and that all future payments on the lease were to be sent to IML. Pyle also owned the other one-half interests in the Jackson and Cassidy notes and forwarded the payments on those notes to IML. When the Jackson note was paid in full, IML received one-half of the proceeds. IML was also involved in real estate deals with Paxton, a corporation in which petitioner was a 50-percent shareholder. The other 50 percent of the *667 stock was owned by Charles M. Byrne. On January 29, 1982, Barbara B. McCulloch granted Paxton an option to purchase lots 35, 39, and 51 of tract 2266 in Rancho Mirage, California. (Hereinafter the lots will be referred to by lot number.) The purchase price of the lots was set at $ 30,000 each if the option was exercised before May 31, 1982. The price increased to $ 35,000 per lot if the option was exercised between June 1, 1982, and May 31, 1983, and to $ 40,000 per lot if the option was exercised between June 1, 1983, and May 31, 1984. The option was to expire if not exercised by May 31, 1984. On May 2, 1984, Paxton entered into an agreement with IML under which Paxton agreed to exercise its option on lots 35, 39, and 51 and simultaneously sell the lots to IML for $ 125,000. The sale was closed on May 31, 1984. The funds for the sale were provided by Evansville, IML's shareholder. On December 31, 1985, IML sold lot 39 to Richard G. and Marie E. Marek for $ 110,000. On July 14, 1986, IML transferred $ 20,000 to Commonwealth Land & Title Co. (Commonwealth), and on November 4, 1986, IML transferred $ 58,000 to Commonwealth. IML owned one-half of the shares of Commonwealth. *668 Commonwealth owned the houses in which the Blanchards' lived from July 1986 until sometime in 1988. Paxton also owned other lots in tract 2266, including lots 16 and 24. On July 24, 1978, Paxton granted a deed of trust to California Canadian Bank on lots in tract 2266, including lots 16 and 24, to secure a $ 1 million loan. Paxton sold lots 16 and 24 to Reno L & T on March 7, 1980, for $ 2,500 subject to the existing liens and deeds of trust. Reno L & T purchased and held the lots for the benefit of SAH. Despite the sale to Reno L & T, Paxton granted a deed of trust on lot 24 to Paul A. Winn, M.D. Employees' Pension Fund on January 12, 1982. Evansville transferred beneficial interest in lots 16 and 24 from one of its subsidiaries, SAH, to another of its subsidiaries, IML, on December 13, 1985. Evansville and IML treated the transfer as a nonrecognition transaction. Lot 24 was sold to Clearwater and Co. in December 1985 for $ 120,000. All of the proceeds of the sale of lot 24 were used to pay off Paxton's obligation to California Canadian Bank. Such a payment was required in order to obtain a release of the bank's security interest in lot 24. Petitioners purchased lots *669 2, 3, 4, 5, 6, and 7 of tract 2266 on October 14, 1977, for $ 238,624.55 in cash and a note for $ 50,000. On January 12, 1978, petitioners entered into an agreement to sell lot 3 to Mel J. Young (Young) and Crestview Cadillac, Inc. Due to a problem with the title, Young and Crestview Cadillac sued petitioners to rescind the sale. As part of the settlement of the litigation, petitioners gave Crestview Cadillac a note for $ 100,000 secured by a deed of trust on lot 3. The deed of trust was recorded on December 1, 1982. In July 1983, petitioners purportedly sold lot 3 to Evansville for $ 175,000. Evansville gave petitioners a note for $ 100,000 at 6-1/2 percent interest. The note was due on April 1, 1987. On July 15, 1983, Evansville executed a document stating that it was transferring its interest in lot 3 to IML. Petitioners executed a deed of lot 3 to IML on September 5, 1983. The deed was never recorded, and no one ever informed Crestview Cadillac, the Riverside County recorder's office, the Riverside County assessor's office, or California Canadian Bank of the sale. Petitioners reported a loss of $ 55,859 on their 1983 Federal income tax return as the result of the sale *670 of lot 3. On March 20, 1984, petitioners purportedly sold lot 4 to Evansville for $ 75,000 cash and the assumption of a $ 60,000 note payable to California Canadian Bank. On the same day, Evansville assigned any interest it had in lot 4 to IML. Petitioners executed a deed in favor of IML on lot 4 on April 2, 1984. The deed was never recorded. No one ever informed the Riverside County recorder's office, the Riverside County assessors office, or California Canadian Bank of the sale. On October 8, 1984, petitioners entered into contracts with B. Lee and Lucile J. Karns (the Karnses) for the sales of lots 3 and 4. The Karnses agreed to pay $ 380,000 for lot 3 and $ 225,000 for lot 4. The sales were closed on December 21, 1984, and the net proceeds of the sales were distributed directly to petitioners. Denver Investors Transactions
On February 1, 1980, USDC obtained a $ 4 million construction loan secured by a deed of trust on part of the Lakewood property. USDC used the funds to build the Marie Callender restaurant (Marie Callender) on lot 4 of the Lakewood property and the Mann 6 Theater movie theater (the Mann Theater) on lot 6 of the Lakewood property. USDC purportedly *671 sold Marie Callender and the Mann Theater to Denver Investors on September 1, 1981. The sale price was $ 3,350,000. Denver Investors paid $ 1,600,000 in cash and executed a note for $ 1,750,000. The interest rate on the note was 22 percent payable annually and the principal balance was due September 1, 1991. The funds for the purchase of the restaurant and the theater by Denver Investors came from USDC as part of a circular flow of funds. Despite the purported sales of Marie Callender and the Mann Theater to Denver Investors, William Dawn continued to manage the properties, and at all times he considered himself an employee of USDC. In addition, the rents from the properties continued to be collected by USDC, and there is no evidence that they were ever paid over to Denver Investors. In 1982 and 1983, USDC listed Marie Callender and the Mann Theater as assets on financial statements. On April 1, 1983, the Blanchards purportedly purchased the Mann Theater for $ 2 million; however, the sale was never recorded. In addition, there is no evidence that any of the rent from the Mann Theater was ever paid to the Blanchards. Instead, all of the rents from the Mann Theater and Marie *672 Callender were paid to USDC until the ultimate sale of the properties to Mother Lode Partnership on October 19, 1984. At the closing on the sale to Mother Lode Partnership, payments were made to pay off various liens on the property. However, no payment was made to USDC to pay off the purchase money note made by Denver Investors on the purported purchases of Marie Callender and the Mann Theater from USDC. Consolidated Mining Co. Transactions
On February 15, 1983, CMC entered into a loan commitment agreement with Eurofinance. Under the agreement, Eurofinance agreed to fund up to $ 3 million in loans to CMC over 20 months. On the same day, Eurofinance entered into an agreement with HKSFG under which HKSFG agreed to fund the loans Eurofinance was making to CMC. From April 22, 1983, through March 23, 1984, CMC received a series of loans totaling $ 3,110,500, $ 2,397,500 in 1983 and $ 713,000 in 1984. For each loan, CMC executed a separate note. The terms of the 1983 notes were all identical. The notes were 10-year notes with a 20-percent interest rate which was adjustable annually. The interest was payable annually beginning on December 31, 1984, and the principal was *673 payable at maturity. The terms of the 1984 notes were identical to the 1983 notes except that the first interest payments were not due until December 31, 1985. No payments were ever made on any of the notes and the loans were unsecured until February 8, 1985, when petitioner signed a security agreement pledging CMC's Dragon Consolidated Mining Co. stock. On its 1984 Federal income tax return, CMC reported, at the beginning of 1984, assets of $ 3,500,000 and liabilities of $ 3,079,281. Eurofinance and HKSFG were acting as conduits for Rowley in the loan transactions. For each note from CMC to Eurofinance there were corresponding notes from Eurofinance to HKSFG and from HKSFG to Rowley. Moreover, the 1983 loan transactions were part of a circular flow of funds that originated with USDC and flowed through New World, Rowley, HKSFG, Eurofinance, CMC, and back to USDC. The funds from the 1984 loans came from the trusts through their subsidiaries, Evansville and Alabaster, into Rowley. The funds from the loans were controlled by petitioner. He prepared detailed instruction on the use of the funds, including transfers to USDC and other companies, whose relationship to CMC is unclear. *674 OPINION In order to make our decision in these cases, we must examine each of the transactions described and ascertain whether it was bona fide transaction or merely a sham. It is a generally accepted principle that "the substance of a transaction rather than the form in which it is cast is determinative of the tax consequences unless it appears from an examination of the statute and its purpose that form was intended to govern." Golsen v. Commissioner, 54 T.C. 742, 754 (1970), affd. 445 F.2d 985 (10th Cir. 1971). In performing substance-over-form analysis, the Supreme Court has "looked to the objective economic realities of a transaction rather than to the particular form the parties employed." Frank Lyon Co. v. United States, 435 U.S. 561, 573 (1978). We have defined a sham as "the expedient of drawing up papers to characterize transactions contrary to objective economic realities and which have no economic significance beyond expected tax benefits." Falsetti v. Commissioner, 85 T.C. 332, 347 (1985). The key to the true nature of a transaction is the intent *675 of the parties involved, which we must discover by analyzing all of the surrounding facts and circumstances. Id. at 348. If the transaction is purported to be a sale, some of the factors to be considered are: (1) Whether legal title passes; (2) how the parties treat the transaction; (3) whether an equity was acquired in the property; (4) whether the contract creates a present obligation on the seller to execute and deliver a deed and a present obligation on the purchaser to make payments; (5) whether the right of possession is vested in the purchaser; (6) which party pays the property taxes; (7) which party bears the risk of loss or damage to the property; and (8) which party receives the profits from the operation and sale of the property. [Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. 1221, 1237-1238 (1981); citations omitted.]
Another relevant factor is whether the deal was made at arm's length. Falsetti v. Commissioner, supra at 348. If the transaction in question is purported to be a loan, some of the important factors to consider are: (1) whether a note *676 or other evidence of indebtedness exists; (2) whether interest is charged; (3) whether there is a fixed schedule for repayments; (4) whether any security or collateral is requested; (5) whether there is any written loan agreement; (6) whether a demand for repayment has been made; (7) whether the parties' records, if any, reflect the transaction as a loan; (8) whether any repayments have been made; and (9) whether the borrower was solvent at the time of the loan. [Goldstein v. Commissioner, T.C. Memo. 1980-273; citations omitted.]
However, we have emphasized that "The key inquiry is not whether certain indicia of a bona fide loan exist or do not exist, but whether the parties actually intended and regarded the transaction to be a loan." Id.
In the instant cases, because respondent has not stipulated the legal effect of many of the operative documents for the transactions at issue, petitioners must do more than merely point to the documents as evidence of the transaction without presenting independent evidence of the substance of the transactions. See Gurdin v. Commissioner, T.C. Memo. 1988-31. Petitioners argue *677 that they have presented such evidence in the form of testimony by petitioner and his attorney in the transactions. However, we did not find petitioner, Breen, or Daniel Parks to be credible and do not consider their testimony to be reliable evidence of the transactions in question. Petitioners have argued rather strenuously that the evidence in these cases demonstrates that the trusts and their subsidiary corporations are separate legal entities and that the informalities in the administration of the trusts are not enough to warrant disregarding the individual entities. Petitioners cite La Fargue v. Commissioner, 689 F.2d 845 (9th Cir. 1982), affg. in part, revg. in part and remanding 73 T.C. 40 (1979), and Stern v. Commissioner, 747 F.2d 555 (9th Cir. 1984), revg. and remanding 77 T.C. 614 (1981), in support of their argument. La Fargue and Stern involved taxpayers who set up foreign situs trusts and transferred property to the trusts in exchange for lifetime private annuities. In those cases, the court scrutinized the transactions and determined that *678 the taxpayers did not have sufficient control over the trusts to justify disregarding the taxpayers' characterizations of the trusts and that any informalities in trust administration were too minor to be of any consequence. Moreover, the court determined that the taxpayers had relinquished control over the property that was transferred, and the trusts were not mere conduits for the income from that property; therefore, the transactions at issue were respected as sales. We agree that, in the cases before us, the informalities in the administration of the trusts and the limited power petitioner had to remove the trustees are not sufficient to warrant disregarding the trusts generally. Nevertheless, we do not find that La Fargue and Stern compel us to conclude that the individual transactions at issue must be respected. The sham transaction doctrine requires us to examine each transaction to determine whether it has economic substance. Such analysis is factual in nature and can be concluded only based on the specific evidence presented in the instant cases. The Plantation Deductions
Respondent disallowed petitioners' deductions for depreciation on the My and Maile *679 plantations for 1984 and 1985, and the deductions in 1984 and 1985 for interest on the New World loan secured by the plantations. Respondent argues that the transfer of the plantations through Sphinx and the creation of the $ 1,400,000 and $ 650,000 debts to New World were shams designed to create interest deductions for petitioners. Respondent's contention is that petitioners purchased and ran the plantations, and the loans and the leases were simply designed to create interest deductions using a circular flow of funds. Moreover, respondent points out that petitioners no longer owned the plantations once they were nationalized and, therefore, were not entitled to depreciation deductions on the properties. Petitioners argue that the transfers of the plantations through Sphinx were commercially reasonable and "involved no more exotic tax planning than an Internal Revenue Code 1031 tax-deferred exchange." In addition, petitioners contend that they retained control over the plantations even after they were nationalized and continued to make mortgage payments and to report the lease payments until their bankruptcy in 1985. Therefore, petitioners assert that they are entitled to depreciation *680 deductions and to interest deductions through 1985. We agree with respondent. As we explain in detail below, we conclude that no section 1031 exchange took place because petitioners never relinquished their ownership of Raleys, Crestview, and the San Francisco and Stockton properties. As a result, there is no reasonable explanation for the transfer of the plantations through Sphinx except as a vehicle for creating interest deductions. The evidence demonstrates that petitioners negotiated the purchases of the plantations and, after the purchases, controlled their operations despite the purported lease to Sphinx and its subsidiary SAH, corporations which petitioners claim are independent legal entities outside of petitioners' control. In addition, the loan transactions themselves were suspect. The loans totaled $ 2,050,000, but were secured by property with a total purchase price of $ 840,000 and total purchase money debt of $ 590,000. Nevertheless, the terms of the loans required only annual interest payments of approximately 11 percent and no principal payments until the notes were due 10 years later. Finally, careful scrutiny of the transaction shows that the interest payments *681 made by petitioners were not bona fide payments; they were simply part of a circular flow of funds. Petitioners would receive payments from SAH under the lease. Then, not coincidentally, petitioners would make interest payments of approximately the same amount to New World. New World was then required to funnel the money back to SAH's parent, Sphinx, in the form of interest payments on the loans Sphinx had made to New World. We conclude that such a circular flow of funds lacked economic substance, especially given the questionable terms of the loans. Accordingly, we hold that petitioners are not entitled to deductions for interest paid to New World on the loans secured by the Vanuatu plantations. In addition, we agree with respondent that petitioners lost any interest they had in the Vanuatu plantations well before 1984 and 1985. The evidence shows that before that time, the plantations had been nationalized by the new Government of Vanuatu, and petitioners had given up hope of ever having the properties restored to their ownership. Even though petitioners continued to operate the plantations after they had been nationalized, they were not entitled to depreciation deductions *682 because such a disposition of the properties would be considered a retirement of the asset from service, and a taxpayer is not entitled to depreciate an asset once it is retired from service. Secs. 1.167(a)-10(b) and 1.167(a)-11(d)(3), Income Tax Regs. Therefore, we hold that petitioners were not entitled to depreciation deductions on the Vanuatu plantations in 1984 and 1985. Global Income
Respondent determined that certain items of income from Global should be included in petitioners' taxable income. Respondent argues that the transfer of Raleys, Crestview, and the San Francisco and Stockton properties to Sphinx, and the subsequent transfer of Raleys, Crestview, and the San Francisco properties to Global were shams. Respondent contends that petitioners continued to exercise the degree of control over those properties consistent with ownership and, therefore, should be taxable on all of the income from their lease and sale. Petitioners argue that the transfer to Sphinx and the subsequent sale to Global were bona fide transactions and that respondent is reading too much into their continued control over the property. Petitioners contend that petitioner exercised control *683 over the property because Sphinx, Global, and the other owners of the property were happy with his management and wanted him to continue to manage the property. Moreover, they assert that the instances in which petitioner held himself out as owner of the properties were merely errors in judgment on his part. We disagree with petitioners' assessment of the evidence. Legal title to the properties was never transferred to Sphinx or Global. Although on paper the parties treated the transactions as transfers to Sphinx and Global, the evidence shows that numerous times from 1978 until 1989 petitioners held themselves out to be the owners of the properties. In addition, others involved with the properties acted as though no sale had occurred. Because all of the properties were leased, neither Sphinx nor Global ever had the right to possession of the properties and neither ever exercised any control over the properties. Finally, all of the income from the lease and sale of the properties went into an account over which petitioners had sole signatory authority, and part of the proceeds from the sale of Raleys to a third party went into petitioners' bankruptcy estate. Based on all of *684 these factors, we conclude that the transfers to Sphinx and Global were shams, and petitioners are liable for Federal income tax on the income from Raleys, Crestview, and the San Francisco properties. We note that respondent has conceded that, if petitioners must include the income from these properties in their income, they are entitled to certain adjustments for operating expenses which are enumerated in respondent's proposed findings of fact. USDC Partnership Losses
Respondent disallowed petitioners' deduction for losses from USDC because USDC underreported the gain on the sales of parts of the Lakewood property and took interest deductions for a purported loan from Rowley through New World that was a sham. Respondent argues that USDC purchased the Lakewood property for $ 7 million, and the purported sales to Rowley and New World were merely shams designed to increase USDC's basis in the Lakewood property and to create an interest deduction. Petitioners argue that, although USDC had the opportunity to purchase the Lakewood property for $ 7 million, the partnership did not have the funds to complete the sale without over $ 1 million of funds from Rowley. Petitioners *685 contend that, because Rowley put up all of the equity for the purchase of the Lakewood property while its interest in the property was subordinated to the other financing loans, it was commercially reasonable for Rowley to receive the first $ 6,500,000 of profit from the development of the property. Petitioners point to all of the paperwork of the sale to support their contention that the sale to Rowley was bona fide. As we noted above, without more, the documents of the sale are not sufficient evidence of the substance of the transaction. Petitioners have provided us with nothing beyond the documents except a rather incredible explanation for the structure of the transaction. Petitioners would have us believe that USDC was willing to pay a $ 6,500,000 premium to Rowley in order to obtain less than $ 2 million of funding for its purchase of the Lakewood property. As we stated about a similar transaction in Thompson v. Commissioner, 66 T.C. 1024, 1051 (1976), affd. 631 F.2d 642 (9th Cir. 1980), "Under the circumstances, the bona fides of such an arrangement are suspect on their face." The evidence shows that petitioner *686 and Miller handled all of the negotiations for the purchase and arranged all of the financing. In addition, until the closing, they held themselves out as the purchasers. The purported loans from Rowley to New World and from New World to USDC for the purchase of the Lakewood property did not require any payments to be made for 3 years, except payments on the purchase money notes from third parties that were wrapped into the loans. In addition, any payments USDC made to New World were funneled through various offshore entities back to USDC. Consequently, we hold that the sale of the Lakewood property to Rowley, the subsequent sale to New World and USDC, and the resulting loans were shams. The true substance of the transaction was a purchase of the Lakewood property by USDC for $ 7 million. House Loan Income and Deductions
Respondent determined that petitioners were required to include in their income for 1984, $ 320,000 that was purportedly a loan from Beneficial. In addition, respondent disallowed petitioners' mortgage interest deductions on that loan and a $ 200,000 loan made by San Martine in 1980. Respondent contends that the loans were not bona fide loans, but were *687 part of a circular flow of funds designed to create interest deductions while keeping the economic consequences within the family. Petitioners argue that the house loans were bona fide loans. Petitioners point to the deeds of trust on their house which secured the loans and the lenders' title insurance policies as evidence of the legitimacy of the loans. Moreover, petitioners contend that their position is strengthened by the fact that petitioners made all of the interest payments on the loans until their bankruptcy in 1985. However, we conclude that the evidence to which petitioners point is not enough. The deeds of trust on petitioners' house were not sufficient security for the loans because in both cases the liens on petitioners' house were greater than the value of the house. Therefore, the loans essentially were unsecured, at least in part. In addition, the fact that the lenders were able to obtain title insurance does not in any way prove that the loans were bona fide. Finally, given the circular flow of the money used to fund the loans and to make the payments, the regular payment of interest has no significance, especially when no principal payments were ever made *688 and no foreclosure proceedings were ever instituted. We conclude that the house loans were shams designed to shuffle petitioners' money around and manufacture interest deductions without any genuine economic consequences. Therefore, we hold that the $ 320,000 loan from Beneficial to petitioners was income to petitioners in 1984 and that petitioners are not entitled to deduct the interest on that loan or the 1980 loan from San Martine. IML Income
Respondent determined that various items of income of IML should be taxable to petitioners in 1984, 1985, 1986, and 1987. Respondent contends that the sales of petitioners' interests in the Washington, LoForti, Cassidy, and Jackson notes and of the Staab oil lease to IML were shams and petitioners are taxable on the income from those assets. In addition, respondent asserts that the sales of lots 35, 39, 51, 16, and 24 by Paxton to IML were shams. Finally, respondent claims that the sales of lots 3 and 4 by petitioners to IML were also shams and petitioners were the actual sellers when the property was sold to third party purchasers. Respondent argues that petitioners controlled these assets and benefited from their ultimate dispositions *689 and, therefore, should be taxable on the income from and on the gain on the sales of those assets. Petitioner argues that the sales of the assets to IML were legitimate business deals that petitioners entered into to raise funds. With regard to the notes and the Staab oil lease, we agree with petitioners. The evidence shows that petitioners surrendered control over the notes and the oil lease and did not benefit from their ultimate disposition. Once the transfer to IML was complete, income payments on the assets were made to IML, not petitioners. Moreover, when the notes became due, IML made the demands for payments and received the funds. Finally, we do not find the discount sale of the LoForti note to petitioners' daughter and son-in-law, 6 years after the sale to IML, to be an indication that petitioners had control over the assets or that they benefited from them. Therefore, petitioners are not taxable on the notes or the Staab oil lease. We also conclude that petitioners are not taxable on the gain from the sales of lots 39 and 24. Although we agree with respondent that there is reason to question the genuineness of the sales to IML, we see no reason to attribute the *690 ultimate sales to petitioners. The owner of the properties before the purported sales to IML was Paxton, not petitioners, and Paxton benefited from one of the sales by having its debt to California Canadian Bank paid off with the proceeds. Petitioners owned 50 percent of Paxton; however, there is no question that for tax purposes they are separate entities. Respondent points to the Blanchards' rent-free use of houses owned by Commonwealth as evidence that petitioners benefited from these sales and should be taxed on them. However, the link between the sales proceeds and the houses is tenuous, and we do not consider it to be a sufficient reason for disregarding Paxton as a corporate entity. However, we conclude that petitioners are taxable on the gain from the sales of lots 3 and 4 to the Karnses. Although petitioners purportedly sold lots 3 and 4 to IML, no deeds were ever recorded and the lienholders on the lots were never told of the sales. Moreover, petitioners acted as the sellers in the transaction with the Karnses. They signed the sales contracts and received the sales proceeds. Therefore, we find that the sales of lots 3 and 4 to IML were shams. Given our above analysis, *691 we hold that petitioners are not taxable on any of the income of IML except the gain on the sales of lots 3 and 4 in Rancho Mirage, California. Denver Investors Income
Respondent determined that the $ 1,045,000 gain on the sales of Marie Callender and the Mann Theater should be taxable to petitioners. Respondent contends that the sales of those properties to Denver Investors and the subsequent sale of the Mann Theater to the Blanchards were shams. Petitioners argue that the sales were bona fide, insisting that the circular flow of funds was commercially reasonable and that USDC received no tax benefit from reporting the transaction as it did. We agree with respondent. Whether or not petitioners actually received a tax benefit is not relevant to the question before us. The relevant inquiry is whether USDC's sales of Marie Callender and the Mann Theater were bona fide. Although on paper they appear to be valid sales, in reality they were not. Neither Denver Investors nor the Blanchards ever received any of the income from the properties. In addition, USDC held itself out as the owner of Marie Callender and the Mann Theater as late as 1983. Moreover, Denver Investors *692 never paid for the properties. The money for the cash downpayment came from USDC as part of a circular flow of funds, and the note for the balance of the purchase price was never paid off. As a result, we hold that petitioners are taxable on the $ 1,045,000 gain on the sales of Marie Callender and the Mann Theater in 1984. CMC Loan Income
Respondent determined that petitioners are taxable on $ 713,000 in loans to CMC in 1984. Respondent argues that petitioner was in complete control of all of CMC's accounts and directed all transfers from those accounts, including those to petitioner's partnership USDC. Moreover, respondent contends that the 1984 loans were not bona fide loans, but were merely devices for funneling funds from offshore to petitioner's partnerships. Petitioners argue that the loans to CMC were bona fide loans. As evidence of their contention, petitioners point to the promissory notes and the increased interest rate, which purportedly compensated the lender for the unsecured nature of the loans. Moreover, they discount petitioner's control over the funds in CMC's accounts as a normal occurrence when a borrower knows a loan is about to be funded. We agree *693 with respondent that the loans were shams and are taxable to petitioners. The 1984 loans were part of a series of loans begun in 1983. The circular flow of the funds in connection with the 1983 loans demonstrates that the parties did not respect the transactions as true loans and were merely using that form to fund USDC while creating interest deductions. Moreover, while the parties observed all of the formalities of loans by executing promissory notes setting forth an interest rate and a schedule of payments, they did not act in a commercially reasonable fashion with regard to the loans. The loans were initially unsecured and there is no evidence of the value of the collateral that was eventually used to secure them. The initial interest payments were not due for more than a year after the loans were made. No interest or principal payments were ever made and no demand for payment was made. Moreover, by the time the 1984 loans were made, the amounts of the loans to CMC were almost equal to the value of its assets. Therefore, we conclude that the 1984 loans were not bona fide loans, but were merely a means to funnel funds from the trusts to petitioners. That the money from *694 the loans should be taxable to petitioners is evidenced by the degree of control petitioner exercised over the funds. Although, at the time, petitioner purportedly had only a 25-percent interest in CMC, he had complete control over the accounts and ordered transfers between CMC and various companies whose ties to CMC are unclear. In addition, petitioner ordered funds from CMC to be transferred to USDC, even though there is no evidence that CMC and USDC were engaged in any business transactions together. Petitioner's exercise of control over CMC's funds gave him the benefit of the purported loans to CMC. Accordingly, we hold that petitioners are taxable on the $ 713,000 loan to CMC in 1984. NOL and Investment Interest Deductions
Respondent disallowed petitioners' net operating loss (NOL) carryforward in 1984, $ 385,402 of which is still at issue, and an $ 18,165 investment interest deduction in 1986. In the proposed findings of fact, respondent asks us to find that petitioners have not introduced any evidence to support their claims to those deductions. Petitioners object to those proposed findings, citing certain accountant's workpapers that are part of the record. *695 Neither party presents any argument on this issue. The workpapers to which petitioners direct us do not prove that petitioners are entitled to the NOL carryforward or the investment interest deduction. In fact, we could find no mention of either in those papers. Petitioners bear the burden of proof on this issue. Rule 142(a). Since petitioners have failed to provide any proof of their entitlement to the NOL carryforward or the investment interest deduction, we hold that those deductions are appropriately disallowed. Global Issues
Respondent disallowed interest and depreciation deductions and NOL carryforwards for Global's 1985, 1986, and 1987 tax years. In addition, respondent determined that Global had additional income from the sale of a carwash in 1986 and from forgiveness of indebtedness in 1987. Neither party has specifically discussed these issues; however, our findings with respect to the Raleys, Crestview, and San Francisco properties transactions affect these adjustments. Because we found that the sales of those properties to Global were shams, petitioners are taxable on the gain from the sale of the carwash; therefore, Global is not taxable on that gain. *696 In addition, because the transactions were shams and Global never owned the properties, it is not entitled to deductions for depreciation or interest related to those properties. Finally, because petitioners and Global have presented no evidence or argument with regard to the remaining issues, we assume that they have conceded those issues, and we uphold respondent's determination. Additions to Tax
Respondent determined that petitioners were liable for increased interest under section 6621(c), formerly 6621(d), for 1984, 1985, 1986, and 1987, and for additions to tax under section 6653(a)(1) and (2) for 1984 and 1985, under section 6653(a)(1)(A) and (B) for 1986 and 1987, and under section 6661 for 1984, 1985, 1986, and 1987. Respondent determined that Global was liable for increased interest under section 6621(c), formerly section 6621(d), for 1985, 1986, and 1987, and for additions to tax under section 6653(a)(1) and (2) for 1985, under section 6653(a)(1)(A) and (B) for 1986, and 1987, and under section 6661 for 1985, 1986, and 1987. Petitioners and Global bear the burden of proof on the additions to tax. Rule 142(a); Bixby v. Commissioner, 58 T.C. 757, 791 (1972). *697 Petitioners' and Global's argument on this issue consists only of general protestations that they kept careful books and records and timely filed their tax returns, and that the transactions in which they engaged were not shams. Given our findings that petitioners and Global engaged in sham transactions for the express purpose of reducing their Federal income taxes, we conclude that their general statements regarding keeping careful books and records and timely filing returns are not sufficient to satisfy their burden of proof. Therefore, we hold that petitioners and Global are liable for additions to tax under sections 6653(a)(1)(A) and (B) and 6661, and for increased interest under 6621(c). Decisions will be entered under Rule 155. Footnotes
1. Cases of the following petitioners are consolidated herewith: Global, Inc., docket No. 3116-91; August E. Waegemann and Barbara A. Waegemann, docket Nos. 22809-91 and 27414-91.↩
1. 0 percent of the interest due on $ 8,014,315.↩
2. 50 percent of the interest due on $ 2,262.052.↩
1. 50 percent of the interest due on $ 280,167.↩
2. 50 percent of the interest due on $ 314,185.↩
3. 50 percent of the interest due on $ 884,045.↩
1. 50 percent of the interest due on $ 1,364,057.↩
1. 50 percent of the interest due on $ 522,730.↩
2. It is not clear why USDC was selling property that was purchased by USSC. There appears to be a very close relationship between the two partnerships, and the parties seem to treat them interchangeably.↩